KIMBERLY MATTOON & others[1] *vs*. CITY OF PITTSFIELD.

No. 99-P-459.

Berkshire. October 12, 2001. - September 27, 2002.

Present: PORADA, SMITH, & GILLERMAN, JJ.

*Water. Municipal Corporations,* Water supply. *Warranty. Uniform Commercial Code,* Warranty. *Negligence,* Municipality. *Practice, Civil,* Dismissal, Admissions. *Evidence,* Expert opinion, Hearsay, Public documents, Opinion.

In a civil action arising out of the plaintiffs' illness allegedly resulting from contamination of the public water supply of the defendant city, the judge acted within his discretion in excluding the testimony of the plaintiffs' expert witness, where the plaintiffs delayed in responding to the judge's order to identify their experts within sixty days; where the plaintiffs canceled three scheduled depositions of the expert; where the judge warned the plaintiffs that he would entertain a motion to preclude the expert's testimony if she had not been deposed before trial; where the plaintiffs failed to provide the judge with an affidavit from the expert's doctor; where the plaintiffs' amendments to their expert's answers to the defendant's interrogatories, filed ten days before the scheduled trial date, introduced new aspects into the expert's testimony and thus required the defendant to depose the expert; where the trial date was imminent; and where a continuance of the trial was not a viable option in the circumstances. [128-134] GILLERMAN, J., dissenting.

In a civil action against the defendant city, the judge properly excluded a certain memorandum, where, even assuming that the memorandum was a public document, it would not be admissible as a public record for the truth of its contents, in that the memorandum was an evaluative report containing multiple levels of hearsay [134-136]; for the same reason, the judge properly excluded three other memoranda, and also properly excluded the testimony of a witness who had not been designated an expert [136-137].

Although statements and documents containing admissions by the defendant in a civil action were admissible as statements by a party opponent, the judge's exclusion of the admissions was not prejudicial because they were cumulative of other evidence admitted at trial. [137-138]

The judge in a civil action did not err in redacting portions of a document that contained facts not personally observable to the author without resort to discretion or judgment, or that contained an expression of opinion, a

---

[1]Sixty-seven named individuals.

conclusion, or a result of an investigation; moreover, the judge properly excluded the testimony of a witness who had not been designated an expert. [138]

In a civil action arising out of the plaintiffs' illness allegedly resulting from contamination of the public water supply of the defendant city, the judge properly dismissed the case pursuant to Mass.R.Civ.P. 41(b)(2), 365 Mass. 803 (1974), where, with regard to the plaintiffs' claim of negligence, the plaintiffs did not present sufficient evidence showing that the city's breach of its duty to provide potable water to its residents caused the harm to the plaintiffs [138-140], and where, with regard to the plaintiffs' claim of breach of warranty, G. L. c. 106, § 2-314, did not cover the city's provision of water to its citizens [140-142].

CIVIL ACTION commenced in the Superior Court Department on November 2, 1993.

The case was heard by *Francis X. Spina*, J.

*Alma R. Arlos* for the plaintiffs.

*Jonathan I. Handler* for the defendant.

SMITH, J. In June of 1988, the plaintiffs brought a class action complaint in the United States District Court for the District of Massachusetts, claiming that they had contracted giardiasis (an illness caused by giardia, a parasite found in the intestines of certain animals) as a result of contamination of the public water supply of the city of Pittsfield (city) in November and December of 1985. The plaintiffs named the city as a defendant, and also named various consultants who had advised the city regarding its water supply. The Federal District Court denied the plaintiffs' motion to certify the class.

The defendants filed motions for summary judgment. On November 13, 1991, the Federal District Court allowed those motions as to the plaintiffs' Federal claims. However, the court dismissed the plaintiffs' State law claims without prejudice to allow the plaintiffs to pursue those claims in Massachusetts courts. The plaintiffs appealed from the judgment disposing of their Federal claims. On November 20, 1992, the United States Court of Appeals for the First Circuit affirmed that judgment. *Mattoon* v. *Pittsfield*, 980 F.2d 1 (1st Cir. 1992).

On November 2, 1993, the plaintiffs filed a timely complaint in Berkshire County Superior Court. The complaint contained counts for breach of express warranty, breach of implied war-

ranty, public nuisance, and negligence. Subsequently, the counts against the various consultants were dismissed, leaving the city as the only defendant.

On November 1, 1994, the city filed a motion for summary judgment. After a hearing, the plaintiffs' public nuisance count was dismissed, but the judge denied the motion with respect to the negligence and warranty counts, ruling that the city was not immune from those claims pursuant to G. L. c. 258. (The city has filed a cross appeal challenging the judge's partial denial of its motion.)

A jury-waived trial on the issue of liability commenced before a Superior Court judge on June 17, 1996. At the end of the seventh day of trial, and after the plaintiffs had rested, the city filed a motion pursuant to Mass.R.Civ.P. 41(b)(2), 365 Mass. 803 (1974), to dismiss the case because the facts and law demonstrated that the plaintiffs had not shown any right to relief. The judge allowed the motion.

On appeal, the plaintiffs challenge the dismissal of their complaint and certain evidentiary rulings made prior to and during the trial.

*Facts.* As background, we recite the evidence introduced at trial in the light most favorable to the plaintiffs. See *Addis* v. *Steele*, 38 Mass. App. Ct. 433, 436 (1995).

As of 1985, the city had for many years owned and operated a public water system and sold water to users in Pittsfield and adjacent communities. The water was stored and used for all purposes. Before distributing the water to residents and businesses, the city treated the water with chlorine.

In 1985, the city, as part of its everyday operation of its water system, took chlorine residual tests and turbidity tests. The more turbidity that was found in the water, the more chlorine had to be added to obtain a required residual level. In addition, the city's health department collected weekly samples of the water and tested it for coliform bacteria, in order to ensure an uncontaminated water supply.

In November of 1985, the city's water was supplied by the Cleveland, Farnham, and Ashley reservoirs. The watersheds feeding those reservoirs contained approximately 6,000 acres.

Also in November of 1985, the city was in the midst of the construction phase of a project to install a system of filtration for the treatment of water. At that time, the city's commissioner for public utilities, William Forestell, made the decision to begin drawing from the city's Ashley reservoir (Ashley) to assist in supplying Pittsfield with water. Ashley was a small reservoir holding approximately 3,000,000 to 4,000,000 gallons of water and was principally supplied by Ashley Lake. Ashley had not been used since approximately July of 1983, but it was needed in 1985 to accommodate the reduced flow from another reservoir occasioned by the construction.

Beavers and other mammals were known by Forestell to inhabit the watershed areas surrounding all of the reservoirs, including Ashley. Giardia cysts can be carried in the intestines of beavers, and if their feces are introduced into a water supply, drinking that water may result in giardiasis. As part of his job, Forestell had to familiarize himself with the potential pollutants of the water in the reservoirs, including giardia. Forestell was also aware that in the past, beavers had been implicated in carrying giardia into the water supply.

On November 5, 1985, a city employee, John Razzano, was told to "start Ashley up." Razzano, however, failed to check the valves on all the pipes designed to chlorinate the water coming from the reservoir. As a result, some of the chlorine went into the wrong water pipe, thereby not completely chlorinating the water flowing from Ashley into the city's water distribution system. It was immediately discovered that the chlorine residual levels obtained at Ashley were not the residuals desired. Although the desired chlorine residual was 3.0 parts per million, the first test showed a reading of 0.5 parts per million. During the month of November, the chlorine residuals did not go above 0.5 parts per million until the final day of the month.

Forestell became aware of the low chlorine residual at Ashley approximately one week after Ashley went on line, but he did not investigate firsthand the cause of the problem until November 30, 1985. On that date, he went to Ashley and discovered that a valve had been left open, which caused chlorine to enter the wrong pipe and thus not go into the water flowing to the consumers. The valve was closed and a chlorine residual of 3.0 parts per million was obtained.

After a person has been exposed to giardia, the incubation period for giardiasis depends upon the amount ingested and can be anywhere from forty-eight hours to one month or six weeks. On the Monday following Thanksgiving in 1985, Dr. George Douglas, a pathologist working with Berkshire Medical Center, discovered an unusual number of giardiasis cases were being presented there for that time of year. He reported that fact to the city's health commissioner, Louis Bolduc, who reported it to the Department of Public Health (DPH) and to the Department of Environmental Quality Engineering (DEQE). An investigative team was formed consisting of employees of the city's health department, the city's water department, the DEQE, the DPH, and the Federal Centers for Disease Control and Prevention. On December 13, 1985, the DEQE issued an order requiring the city to advise its residents to boil water prior to consumption. The DEQE also asked the city to increase the chlorine amount in the water system. In December of 1985, Ashley was taken off line and not reopened until the city's new filtration plant began operation. The DEQE lifted the requirement to boil water on January 24, 1986.

1. *Exclusion of plaintiffs' expert's testimony.* In dismissing the plaintiffs' complaint, the judge ruled, among other things, that although the city had a duty to provide clean water to its consumers, the plaintiffs did not introduce evidence that the lower chlorine levels in the water were the proximate cause of the plaintiffs' injuries. The plaintiffs claim that the failure of the plaintiffs' proof on the causal connection element was the result, among other things, of the judge's allowance of the city's emergency motion to preclude the testimony of the plaintiffs' expert, which the plaintiffs argue was an abuse of discretion.

We summarize the events leading up to the judge's decision on the motion. The summary is taken from the arguments of both counsel made at the hearing on the motion, and also from certain documents attached to the motion. On appeal, the plaintiffs do not dispute the city's version of the events, but rather argue that the judge misinterpreted the significance of the events.

In 1989, while the matter was in Federal court, the plaintiffs identified Serena DiMagno as their expert. After the plaintiffs'

complaint was filed in the Superior Court, the resulting tracking order listed December 22, 1995, as the date by which discovery was to be completed. By that date, the plaintiffs' expert had not been deposed. At some time later, June 17, 1996, was scheduled as the trial date.

On October 6, 1995, new counsel filed an appearance for the city. On January 16, 1996, the city's new attorney wrote to plaintiffs' counsel inquiring if DiMagno was still the plaintiffs' expert and, if so, he requested that she be made available to have her deposition taken within the next two months. On January 25, the plaintiffs' attorney responded that their expert was still DiMagno but that she was "less important" than some other experts that the plaintiffs had under consideration. The following day, the city's attorney requested that a pretrial conference be held to determine, among other things, the identification of trial witnesses, including experts. The conference was held on February 12, at which time the judge indicated that the plaintiffs had to identify within sixty days their experts who would testify at the trial.

The plaintiffs did not identify their experts within the time limit set by the judge, and on April 19, the city's attorney faxed a letter to the plaintiffs' attorney requesting that identification. On April 22, the plaintiffs' attorney notified the city's attorney that their only expert was DiMagno. On that day, and on April 26 and May 2, the city's attorney requested information from the plaintiffs' attorney in regard to the availability of DiMagno for a deposition. Although it was past the discovery deadline, plaintiffs' counsel did not object to the request.

On May 6, the plaintiffs' attorney advised the city's attorney that DiMagno would be available on May 21, 22, or 23 for a deposition and that her rate for preparation and being deposed was $100.00 per hour. The next day, the plaintiffs' attorney notified the city's attorney that DiMagno required thirty hours to prepare for the deposition. The city's attorney replied that $3,000 for DiMagno to prepare for a deposition was unreasonable. The plaintiffs' attorney agreed to split the costs of DiMagno's preparation.

The deposition was scheduled for May 22 in DiMagno's office in Hershey, Pennsylvania, but the city's attorney was noti-

fied on May 13 that the deposition had to be postponed because DiMagno was not available due to conflicts in her schedule. The date of May 29 was agreed upon for the deposition but on May 28, the plaintiffs' attorney advised the city's attorney that DiMagno was ill and therefore could not be deposed the next day. The deposition was then rescheduled for June 3, to be held in the plaintiffs' attorney's office in Pittsfield. On May 31, the plaintiffs' attorney advised the city's attorney that DiMagno was still ill and unavailable for the taking of her deposition on June 3. At a status conference with the judge held on June 3, the city's attorney informed the Superior Court judge of his inability to depose DiMagno. The judge indicated that if DiMagno had not been deposed before trial, he would seriously entertain a motion to preclude her testimony.[2]

On June 5, the city's attorney received from plaintiffs' attorney a copy of a handwritten note dated June 5, from a doctor in Lancaster, Pennsylvania, stating that DiMagno had "been under [his] care for sinusitis from May 28, 1996 till present." There was nothing in the note that indicated that because of her condition, DiMagno was unable to travel to Pittsfield or to testify at a deposition. At no time did the plaintiffs' attorney submit affidavits from DiMagno or her doctor in regard to the condition of her health, and whether as a result she would be unable to travel or testify at a deposition or the trial.

On June 7, the plaintiffs served amended answers to the city's interrogatories and stated a new subject of DiMagno's proposed testimony. Her testimony, according to the amended answers, would also include "the maximum contaminant levels and the proper chlorination levels and procedures for varying conditions required for a properly managed water system." In contrast, the 1989 answers to interrogatories indicated that DiMagno would testify that the city mismanaged the watershed surrounding Ashley, failed to adequately test the water for all kinds of contaminants, failed to maintain and properly operate its chlorination equipment, and mismanaged its water system.

On June 11, the plaintiffs' attorney notified the city's attorney

---

[2]That comment of the judge was included in the city's motion to exclude DiMagno's testimony. The plaintiffs in their brief do not dispute that the comment was made.

that although DiMagno was "very weak and ill," she could be deposed in Hershey for "approximately two hours a day." The next morning, the city's attorney filed the emergency motion to preclude DiMagno's testimony. After listening to arguments of counsel for both sides, the judge allowed the motion that day. The judge did not give the reasons for his decision at that time. However, during the trial, the plaintiffs filed a motion for reconsideration of the judge's decision. In denying that motion, the judge stated the following as his reasons for the allowance of the city's earlier motion: "There was a change in defense counsel, and an agreement to permit the [c]ity to depose plaintiffs' expert. That agreement was breached by a claim of unavailability of the expert, unsupported by any affidavit. The [c]ity relied on that agreement in not seeking an extension of the discovery deadline."

The plaintiffs claim that the judge abused his discretion in precluding their expert witness's testimony because there was no court order that was violated by the plaintiffs and there was no wilful failure by the plaintiffs to provide discovery or to have the deposition taken.[3]

"Trial judges have 'broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial. . . . Within this discretion lies the power to exclude or deny expert testimony . . . and to exclude testimony of witnesses whose use at trial is in bad faith or would unfairly prejudice an opposing party.' " *Nally* v. *Volkswagen of America, Inc.*, 405 Mass. 191, 197 (1989), quoting from *Campbell Indus.* v. *M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). Therefore, in reviewing a trial judge's sanction order of the nature imposed

[3]The plaintiffs cite Mass.R.Civ.P. 37(b)(2), 365 Mass. 797 (1974), as stating that noncompliance must be wilful. However, wilful noncompliance under the rule was eliminated in 1984 as a prerequisite to the imposition of discovery sanctions. See Mass.R.Civ.P. 37(b)(2), as amended, 390 Mass. 1208 (1984); *Atlas Tack Corp.* v. *Donabed*, 47 Mass. App. Ct. 221, 224 (1999). Under Mass.R.Civ.P. 37(d), 365 Mass. 797 (1974), wilfulness is required to show failure of a party to attend his own deposition or failure to serve answers to interrogatories or respond to a request for inspection.

Our use of the term "sanction" in this opinion is not meant in the sense of Mass.R.Civ.P. 37(b)(2), which did not strictly apply here in the absence of an explicit discovery order. Rather, we use the word "sanction" simply as a shorthand description of the judge's action.

here, an abuse of discretion standard controls. See *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642 (1976). The standard is applicable to the judge's finding that a sanction needed to be imposed and also to assess the appropriateness of the sanction imposed. See *Thibeault* v. *Square D Co.*, 960 F.2d 239, 243 (1st Cir. 1992).

In this matter, discovery was closed as of December 22, 1995. There was no request by the city for an extension of the discovery period. The judge found, however, and it is supported by the arguments of both counsel before him, that the plaintiffs had agreed that their expert could be deposed. Further, it is clear that the city had relied upon the agreement and therefore failed to request an extension of the discovery period. For undoubtedly the same reason, the city did not request an order under Mass.R.Civ.P. 37 compelling compliance with the agreement. We do not think the city, which refrained from seeking such an order because it relied upon a promise of the plaintiffs to produce their expert for a deposition, should be punished for their failure to seek an order compelling compliance. See *Saud* v. *Fast Forward, Inc.*, 41 Mass. App. Ct. 643, 647-648 (1996), where the court upheld a trial judge's action in excluding certain documents that had not been produced in discovery despite the fact that the opposing party had not moved for an order compelling discovery.

The plaintiffs argue that they should not be punished because their expert became ill, causing the deposition to be delayed. We note that the plaintiffs had the responsibility, after their expert became ill, to furnish the judge with at least an affidavit from the doctor treating the expert, setting forth the nature, extent and duration of the illness.

We hold that, in view of the circumstances, the judge did not abuse his discretion in imposing sanctions. Those circumstances include the following: the delay of the plaintiffs in responding to the judge's order to identify their experts within sixty days of the pretrial conference; the plaintiffs' cancellation of three scheduled depositions, the latter two allegedly caused by the expert's illness; the warning by the judge to the plaintiffs on June 3 that he would seriously entertain a motion to preclude the expert's testimony if she had not been deposed before trial;

the failure of the plaintiffs to provide the judge with an affidavit from the expert's doctor; the plaintiffs' amendments to their expert's answers to the city's interrogatories, filed some ten days before the scheduled trial date, which introduced new aspects into the expert's proposed testimony, thus requiring the city to depose the expert; and the imminence of the scheduled trial date.

Our analysis does not stop here because we must now decide whether the exclusion of the expert testimony was the only sanction available to the judge. We consider whether a sua sponte continuance of the trial would have been more appropriate in the circumstances.[4]

As we have already stated, the plaintiffs did not submit an affidavit from the expert's treating physician as to the nature, extent and duration of the expert's illness. The only evidence before the judge was that because of her illness, the expert could only be deposed for two hours a day in Hershey. That information was not enough to justify a continuance, in view of the lack of the affidavit.

Further, the claimed injuries to the plaintiffs occurred some eleven years before the judge's actions on the motion. Both the plaintiffs and the city were entitled to a final resolution of the matter on the scheduled trial date, not at some uncertain and undetermined time in the future. We also note that there are limited facilities available in Berkshire County for the Superior Court to conduct both its civil and criminal business, with criminal business having priority because of Mass.R.Crim.P. 36(b), 378 Mass. 909 (1979) (Commonwealth must try defendants in criminal cases within one year of the arraignment). See *Commonwealth* v. *Marable*, 427 Mass. 504, 505 (1998). Thus, because of the nature and complexity of the issues in the trial, a substantial block of time would have to be set aside,

[4]Although the plaintiffs acknowledged on June 11 that their expert was too ill to be deposed except for a short time in Pennsylvania, with the trial date set for June 17, the plaintiffs did not file any motion to continue the trial because of the unavailability of their expert. Contrast *Monahan* v. *Washburn*, 400 Mass. 126, 129-130 (1987).

Further, at no time during the hearing on the city's motion did the plaintiffs argue that the judge had other options less drastic than the exclusion of the expert's testimony.

some time in the future, with no assurance that the expert would be available at that time.

In these circumstances we hold that a continuance could properly be viewed as not a viable option and that the judge's decision to preclude the expert's testimony was an appropriate sanction and "did not rest on whimsy, caprice, or arbitrary or idiosyncratic notions." *Bucchiere* v. *New England Tel. & Tel. Co.*, 396 Mass. 639, 642 (1986).

2. *Exclusion of August 5, 1987, memorandum.* Prior to trial, the city filed a motion in limine to exclude from introduction in evidence a memorandum from the "Division of Field Services Epidemiology Program Office" to the "Director, Centers for Disease Control," dated August 5, 1987. In its motion, the city claimed that the memorandum was "inherently unreliable because of multi-layered hearsay and is inadmissible as a public record, as a business record, or on any conceivable ground." After listening to arguments by counsel, the judge allowed the motion.

At trial, the plaintiffs requested the judge to reverse his decision and allow the memorandum to be introduced in evidence. The plaintiffs cited the testimony of Dr. George Grady, who testified that as assistant commissioner of the DPH he ordered an investigation of the outbreak of giardiasis in 1985 in Pittsfield[5]; that the August 5 memorandum consisted of the results of the investigation by persons who reported directly to him; and that the memorandum, itself, was part of the official records of the DPH. The judge excluded the memorandum.

The excluded memorandum consists of ten pages of narrative with various subsections entitled "SUMMARY," "INTRODUCTION," "BACKGROUND," "ENVIRONMENTAL INVESTIGATION," "DISCUSSION," and "RECOMMENDATIONS." Attached to the memorandum are seven pages of tables, maps, and diagrams. The memorandum was captioned "FOR ADMINISTRATIVE USE," "LIMITED DISTRIBUTION," and "NOT FOR PUBLICATION."

The plaintiffs argue, citing Liacos, Massachusetts Evidence

---

[5]Pursuant to G. L. c. 111, §§ 5, 7, the DPH is authorized, among other things, to conduct investigations into causes of diseases.

§ 8.13.1, at 504 (6th ed. 1994), that the memorandum was admissible under the common-law rule that a public record is admissible as evidence of the truth of the facts recorded therein if it has been prepared by a public official acting within the scope of his duty.[6] We reject the plaintiffs' argument because even if we assume that the memorandum was a public document, it would not necessarily be admissible for the truth of its contents. See *Amory* v. *Commonwealth*, 321 Mass. 240, 252 (1947).

"Neither Massachusetts common law nor Proposed Mass.R. Evid. 803(8)(C), allowing a hearsay exception for public documents, permits admission of 'evaluative reports' or opinions or conclusions in government reports. This is acknowledged to be contrary to Federal practice." *Herson* v. *New Boston Garden Corp.*, 40 Mass. App. Ct. 779, 792 (1996). See *Commonwealth* v. *Slavski*, 245 Mass. 405, 417 (1923) ("records of investigations and inquiries conducted, either voluntarily or pursuant to requirement of law, by public officers concerning causes and effects involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are not admissible in evidence as public records"). See also *Middlesex Supply, Inc.* v. *Martin & Sons, Inc.*, 354 Mass. 373, 374-375 (1968) (statement in report of deceased assistant fire chief, regarding probable cause of fire, held inadmissible opinion).

Initially, it is not clear from the memorandum or from Dr. Grady's testimony whether the authors of the report were indeed public officials. The various sections of the memorandum intermingle facts obviously not observed by the authors of the memorandum with opinions and references to other sources, other diseases, and conclusions.

The memorandum also consists of hearsay, multi-layered in some parts. Much of the written analysis, certain tables, and the figures were derived from laboratory trials that were not performed by the authors, and also from two telephone surveys of the general population of Pittsfield.

[6]Although the Legislature has drafted statutes allowing the admission in evidence of certain types of public documents for the truth of the facts asserted therein, see, e.g., G. L. c. 111, § 195 (reports of lead paint investigators), there is no such statute pertaining to reports of the DPH that have been created pursuant to its authority under G. L. c. 111, §§ 5, 7.

It is also clear that, beyond the memorandum being an excludable "evaluative report," the opinions expressed in the memorandum are in the nature of expert opinions. "Under Mass. R.Civ.P. 26(e)(1)(B), 365 Mass. 776 (1974), a 'party is under a duty seasonably to supplement his response with respect to . . . the identity of each person expected to be called as an expert witness.' " *Kearns* v. *Ellis*, 18 Mass. App. Ct. 923, 924 (1984). Because the plaintiffs did not disclose the authors of the memorandum as experts, their "testimony" by way of the memorandum was properly excluded.

The entire memorandum was properly excluded. If there had been redaction of the objectionable portions of the memorandum, the remaining parts would have been cumulative of other evidence in the plaintiffs' case. Thus, even if there was error in excluding the entire memorandum, the plaintiffs were not prejudiced.

3. *Exclusion of three memoranda to, and testimony of, Dr. George Grady.* The plaintiffs claim that the trial judge erred when he excluded from evidence three memoranda[7] to Dr. Grady because their authors had not been designated as experts. The court also excluded the testimony of Dr. Grady on similar grounds. The plaintiffs argue that the memoranda were admissible as public records and Dr. Grady need not have been identified as an expert in order for him to answer certain questions posed by plaintiffs' counsel. For the reasons outlined in part 2 of this opinion, the memoranda were properly excluded.

Here, the December 12, 1985, memorandum was from Joel R. Greenspan, M.D., a medical epidemiologist. The December 20, 1985, and January 8, 1986, memoranda were from Greenspan, Lynne Mofenson, M.D., and Jo-Ann Harris, M.D. It is not entirely clear from this record that Greenspan, Mofenson, and Harris were public officers. The plaintiffs also have not shown that the memoranda were written in the performance of official duty, i.e., by public officials with a public duty to record the particular type of facts to which they allude. It also appears that many of the facts that were contained in the memoranda were not personally observed by the various authors. The

_____

[7]The memoranda are dated December 12, 1985; December 20, 1985; and January 8, 1986.

authors were conducting investigations of facts that had been recorded by someone else. Furthermore, the memoranda contain expressions of opinion, conclusions, and results of investigations, precisely what is excluded by Massachusetts common law. The memoranda were thus properly excluded.

The trial judge also properly excluded the testimony of Dr. Grady because his opinion would have been in the nature of an expert opinion and he was not designated as an expert witness. See *Kearns* v. *Ellis*, 18 Mass. App. Ct. at 924-925.

4. *Exclusion of admissions by city.* The plaintiffs claim that the judge wrongfully excluded from evidence admissions by the city relating to the Ashley chlorinator and the source and extent of the giardia epidemic. The judge excluded the admissions because they contained hearsay and reflected opinion testimony.

Generally, a witness may testify to facts observed by him and may not give an opinion based on those facts. See *Olson* v. *Ela*, 8 Mass. App. Ct. 165, 167 (1979); *Commonwealth* v. *Wolcott*, 28 Mass. App. Ct. 200, 207 (1990). Lay and expert witnesses are precluded from giving an opinion, for the most part, that involves a conclusion of law or in regard to a mixed question of fact and law. See, e.g., *Perry* v. *Medeiros*, 369 Mass. 836, 842 (1976); *Commonwealth* v. *Brady*, 370 Mass. 630, 635 (1976). The opinion rule, however, does not apply to evidentiary admissions, also known as statements of a party opponent. See *Hallett* v. *Rimer*, 329 Mass. 61, 62-63 (1952). Statements of a party opponent need not be made on personal knowledge to be admissible, i.e., any statement of a party is admissible against him if not objectionable on grounds other than hearsay. See Liacos, Massachusetts Evidence § 8.8.1 (7th ed. 1999).

Here, the plaintiff complains that the trial judge should have admitted a statement by the superintendent of the city's water department, Paul Pierce, in which he admitted in a deposition that he became aware that Pittsfield water was contaminated by giardia when he was so informed by Forestell; a document prepared by Forestell in which he characterized the chlorination at Ashley as "inadequate" and admitted that the Ashley chlorinator was not set up properly; a document written by Bolduc detailing a chronology of events from November 5, 1985, through January 1, 1986, illustrating the chlorine levels and

coliform counts from samples taken at such places as the Williams School in Pittsfield; and statements by Razzano in which he said, in his deposition, that he knew something was wrong at Ashley reservoir when the desired residuals were not obtained.

The statements and documents at issue were admissible as statements by party opponents. Exclusion of the evidence, however, was not prejudicial because it was cumulative. For example, there was evidence that beavers were in the watershed area and that beaver feces carry giardia, leading to the inference that the water may have been contaminated with giardia; evidence that levels of chlorine mandated by Massachusetts regulations were not obtained at Ashley in November of 1985; and evidence of low chlorine levels and high coliform bacteria count in Ashley during the relevant period.

5. *Exclusion of parts of DEQE boil order and testimony of John Higgins.* The plaintiffs claim that portions of the December 17, 1985, order of the DEQE were admissible as parts of a public record. The plaintiffs also claim that the testimony of John Higgins was admissible even though he was not designated as an expert.

Here, the trial judge ordered that some statements be redacted from the DEQE order on the grounds that the statement of facts and a phrase relating to causation were not primary facts and contained impermissible statements of judgment.

The trial judge did not err. The statement of facts detailed non-primary facts, i.e., facts that were not personally observable by the author without resort to discretion or judgment. See *Adoption of George*, 27 Mass. App. Ct. 265, 273-274 (1989). Furthermore, the phrase relating to the cause of the giardiasis outbreak was inadmissible because it was an expression of opinion, conclusion, or a result of an investigation. These items were impermissible portions of public records and were properly redacted.

Regarding the exclusion of Higgins's testimony, we find the exclusion proper because his testimony would have been in the nature of expert opinion and he was not designated as an expert. See *Kearns* v. *Ellis*, 18 Mass. App. Ct. at 924-925.

6. *The judge's allowance of the rule 41(b)(2) motion.* Judgment having been entered on the merits of the city's motion

pursuant to Mass.R.Civ.P. 41(b)(2), 365 Mass. 803 (1974), the trial judge was required to "make findings as provided in [Mass. R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996)]." Our review, as in any case where the judgment is based on findings of fact under rule 52(a), is under the clearly erroneous standard. See Smith & Zobel, Rules Practice § 41.10 (1977). We also note that "in passing upon a motion under the second sentence of rule 41(b)(2) a trial judge is not limited to that standard of proof required for a directed verdict . . . rather, the judge is free to weigh the evidence and resolve all questions of credibility, ambiguity, and contradiction in reaching a decision." *Ryan, Elliott & Co.* v. *Leggat, McCall & Werner, Inc.*, 8 Mass. App. Ct. 686, 689 (1979).

a. *Dismissal of negligence claim.* In allowing the city's motion pursuant to rule 41(b)(2), the judge ruled that the city had a duty to provide potable water to the city's residents who were connected to the water distribution system. The judge, however, ruled that the plaintiffs had not presented any evidence as to whether any breach of that duty caused the harm to the plaintiffs.

The plaintiffs argue that they did indeed present sufficient evidence with respect to the causation element of their negligence claim. The plaintiffs further claim that expert evidence was not necessary because the question of causation was within the ken of the average juror.

We agree with the trial judge because although the plaintiffs presented sufficient evidence of the city's breach of its duty, they did not present sufficient evidence of causation.

The plaintiffs presented evidence that the city knew that there were beavers in the watershed area and that beavers carry giardia. That evidence may lead to the inference that the water supply may have been contaminated with giardia. The plaintiffs also presented evidence that chlorination was the only treatment of Pittsfield water at that time and that the chlorine levels mandated by the Massachusetts regulations were not always obtained in the distribution system in November of 1985. That evidence may lead to the inference that the water in the Ashley reservoir may not have been adequately chlorinated.

The evidence also showed that there was a high coliform bacteria count in the Ashley reservoir water and that the number

of giardiasis cases was higher than usual. The plaintiffs also presented evidence that the DEQE investigated and subsequently closed Ashley, as well as issued a boil water order. That evidence may lead to the rational inference that Pittsfield residents were ill and that Pittsfield water may have been contaminated with bacteria. See *Continental Assur. Co.* v. *Diorio-Volungis*, 51 Mass. App. Ct. 403, 410 (2001).

These inferences are not enough here to establish causation in the absence of expert testimony. See *Enrich* v. *Windmere Corp.*, 416 Mass. 83, 87 (1993) (presence of defects in electric fan could not be inferred in absence of expert testimony). Expert testimony was required to show the presence of giardia cysts in the water in sufficient quantities to cause injury and the effect of various concentrations of chlorine on giardia cysts. Without expert testimony, the liability of the city for the plaintiffs' alleged injuries was left to "conjecture and surmise." *Stewart* v. *Worcester Gas Light Co.*, 341 Mass. 425, 435 (1960). Therefore, the judge properly dismissed the plaintiffs' negligence claim.

b. *Dismissal of warranty claims.* The plaintiffs' warranty claims were brought under art. 2 of the Uniform Commercial Code (code), G. L. c. 106, § 2-314 (merchantability) and § 2-315 (fitness for particular purpose). Liability for breach of warranty under the code is " 'congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A (1965),' which defines the strict liability of a seller for physical harm to a user or consumer of the seller's product." *Hayes* v. *Ariens Co.*, 391 Mass. 407, 412 (1984), quoting from *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 353 (1983). Here, the judge ruled that the plaintiffs did not meet their burden of showing that the water was defective and unreasonably dangerous. The plaintiffs claim error.

As a threshold matter, the code's art. 2 warranty provisions are limited to transactions in "goods." See G. L. c. 106, § 2-102. "Goods" is a term defined in G. L. c. 106, § 2-105(1) as "all things . . . which are movable at the time of identification to the contract for sale." The plaintiffs argue that because water is a thing that is movable, its provision by a municipality is governed by art. 2 of the code. The city argues, however, that provision of water by a municipality is not a sale of goods but

rather the rendering of a service and, therefore, the judge should have, as matter of law, dismissed the breach of warranty claims. There are no decisions in Massachusetts on this issue and decisions in other jurisdictions are divided.

In *Gall* v. *Allegheny County Health Dept.*, 521 Pa. 68, 74-75 (1989), the court ruled that the sale of water by a municipality did constitute the sale of goods under the Uniform Commercial Code. In accord is *Zepp* v. *Mayor & Council of Athens*, 180 Ga. App. 72, 75-77 (1986). However, in *Coast Laundry, Inc.* v. *Lincoln City*, 9 Or. App. 521, 528-529 (1972), the court held that sale of water by a municipality to a customer-laundry was not a sale of goods within the scope of art. 2 of the Uniform Commercial Code.[8]

In contrast to the sale of goods, the rendition of services is not covered by art. 2 of the code. See *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 131-132 (1982); *Cumberland Farms, Inc.* v. *Drehmann Paving & Flooring Co.*, 25 Mass. App. Ct. 530, 534 (1988). Where a contract is for both sales and services as here, in order to determine whether art. 2 is applicable, the test is whether "the predominant factor, thrust, or purpose of the contract is . . . 'the rendition of service, with goods incidentally involved.' " *Ibid.*, quoting from *Bonebrake* v. *Cox*, 499 F.2d 951, 960 (8th Cir. 1974).

Water is a unique product and is essential to human health and well-being. Here, the city did not create or manufacture the water. Rather, the city, by a system of reservoirs, captured the water from brooks, streams, and rainfall. It treated the water and then distributed it to its citizens. Although the city charged a sum for the water, that rate reflected the cost of storage, treatment and distribution. Thus, it is clear that the predominant fac-

---

[8]In *Canavan* v. *Mechanicville*, 229 N.Y. 473 (1920), the court held that the furnishing of water by a municipal corporation to consumers is a sale of goods, but the court also held that a negligence standard should apply because a municipality cannot be expected to eliminate all water contaminants.

*Canavan* was a pre-code decision. However, in *Sternberg* v. *New York Water Serv. Corp.*, 155 A.D.2d 658, 659 (N.Y. App. Div. 1989), the court relied on *Canavan* and ruled that although municipal sale of water is a sale of goods, warranties do not apply.

tor, thrust, or purpose of the activity was the rendition of services and not the sale of goods.[9]

Sound public policy helps dictate our result. The watershed feeding the city's reservoirs consisted of approximately 6,000 acres, much of which was accessible to the public. As such, the water supplied by the city cannot practically be protected against all potential contamination from humans and animals. See *Canavan* v. *Mechanicville*, 229 N.Y. 473, 479-480 (1920). The cost to protect the water in the reservoirs would be prohibitive.

Therefore, we hold that the code did not cover in this instance the city's provision of water to its citizens and the judge properly dismissed the claims for breach of warranty.[10]

In light of the foregoing, we need not address the city's argument, made in its cross appeal, that it was immune from liability under the Massachusetts Tort Claims Act, G. L. c. 258.

*Judgment affirmed.*


GILLERMAN, J. (dissenting). The critical event is the judge's explanation, delivered during the trial, for his having previously allowed, at a pretrial conference, the city's motion to preclude the testimony of plaintiff's expert, Serena DiMagno. The judge said that he had allowed the city's motion because the plaintiffs breached their agreement to permit the city to depose the plaintiffs' expert "by a claim of unavailability of the expert, unsupported by any affidavit." The judge added that the "[c]ity relied on that agreement in not seeking an extension of the discovery deadline."

The majority opinion is clear that the plaintiffs did not claim that their expert was "unavailable." On June 11, 1996, the plaintiffs did claim that their expert could testify only two hours

---

[9]See Orthman, Implied Warranties for Sales of Water: Have the Courts Applied the Wrong Test?, 30 U.C. Davis L. Rev. 543, 559-563 (1997), where the author argues that the courts should adopt the sale versus service test in deciding that the code does not apply to the furnishing of water by municipalities to their citizens.

[10]We express no opinion whether commercial vendors of bottled water would be subject to warranty claims under art. 2 of the Uniform Commercial Code.

a day in Hershey. Further, the discovery deadline — December 22, 1995, according to the majority opinion — had long since passed when the city agreed to depose the plaintiffs' expert on May 22, 1996, and later agreed to yet another postponed date of June 3, 1996. There is nothing in the majority opinion to indicate that the city objected to passing the December 22 deadline. That date clearly had been waived by the parties.

The judge himself ignored the December 22 deadline when, on June 3, 1996, he held a status conference with counsel. It was at that conference that the judge made it clear that Di-Magno had to be deposed by the city before trial. The majority opinion again makes it clear that there was no mention by the city, or by the judge, that December 22 had passed and that there could be no further discovery.

The judge's impatience with the performance of plaintiffs' counsel in the management of the plaintiffs' case is certainly understandable. But this was no trivial claim. There was substantial evidence that the city's water was not properly treated or managed. However, the illness that overtook the nearly seventy plaintiffs would come to nothing without an expert to establish the nexus between the city's water and the illness of the plaintiffs. The importance of testimony from the plaintiffs' expert witness was surely evident to the parties and to the judge, and the exclusion of that testimony made the unfavorable result to the plaintiffs a foregone conclusion. This was not the case — nor was the judge's order the time — to collapse the plaintiffs' claim for reasons that were unsupported.

The plaintiffs were effectively deprived of their day in court on a matter of public importance to their community. I conclude, reluctantly, that the judge's order suppressing any testimony from the plaintiffs' expert was an abuse of his discretion, resulting in a miscarriage of justice to the plaintiffs. There should be a new trial.