AUGIS CORPORATION *vs.* MASSACHUSETTS COMMISSION
AGAINST DISCRIMINATION & another.[1]

No. 08-P-1271.

Norfolk. March 11, 2009. - October 14, 2009.

Present: McHUGH, GREEN, & FECTEAU, JJ.

*Anti-Discrimination Law,* Employment, Race, Damages. *Employment,* Discrimination. *Massachusetts Commission Against Discrimination. Administrative Law,* Hearing, Evidence, Substantial evidence. *Damages,* Emotional distress. *Emotional Distress.*

At the hearing on a complaint filed with the Massachusetts Commission Against Discrimination, alleging discrimination in employment based on race, the hearing officer did not abuse her discretion in prohibiting the employer from calling a certain witness to testify as a sanction for the employer's bad faith in failing to cooperate after the illness of its attorney frustrated the employee's ability to comply with a discovery deadline for the deposition of that witness; further, any error arising from the exclusion of another witness's testimony, on the ground that his name first appeared on the employer's witness list shortly before the hearing, was harmless, in that the exclusion of the witness's testimony did not deprive the employer of any substantial rights. [402-406]

In a civil action, a Superior Court judge did not err in affirming a decision of the Massachusetts Commission Against Discrimination (commission) that an employer had engaged in racial discrimination against the complaining employee, where the award of damages was not based on uncharged conduct, in that the employee's allegation that he was singled out for harsh treatment because of his race was a visible, central component of his over-all claim [406-407]; where there was substantial evidence to support the commission's finding, based on a single incident, that the employer was liable for discrimination of a type G. L. c. 151B, § 4, prohibits [408-409]; and where there was substantial evidence to support the commission's award of damages for emotional distress [409-410].

CIVIL ACTION commenced in the Superior Court Department on October 16, 2003.

The case was heard by *Barbara A. Dortch-Okara,* J., on a

[1]Franklin McCreath.

motion for judgment on the pleadings, and a motion for attorney's fees and costs was also heard by her.

*Peter R. Fenn* (*Lowry Heussler* with him) for the plaintiff.

*Simone R. Liebman* for Massachusetts Commission Against Discrimination.

*Annette Hill Green*, for Franklin McCreath, was present but did not argue.

McHugh, J. Franklin McCreath filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) alleging that his employer, Augis Corporation, doing business as Elite Protective Services (Augis), engaged in racial discrimination. After a public hearing, an MCAD hearing officer agreed and awarded McCreath $10,000, plus costs and attorney's fees. Augis appealed to the full commission, which affirmed the hearing officer's decision but reduced the attorney's fee award by one-half. Augis then appealed to the Superior Court, which in turn affirmed the decision of the MCAD. Augis now appeals to this court, claiming that the MCAD decision is erroneous and that the MCAD proceedings were infected by a series of procedural errors. We affirm.

*Background.* The administrative record reveals that McCreath is a black man of Jamaican descent who worked for Augis, a security services firm, as a security officer at the Hammond Park Condominiums (Hammond Park) in the Chestnut Hill section of Brookline. McCreath had a history of difficulty with his supervisor, Neil Lesman. On several occasions, Lesman disciplined McCreath for work rule violations such as making personal telephone calls, washing his motor vehicle while on duty, and leaving his post with an insufficiently trained replacement.

On November 3, 1999, Lesman and McCreath got into an argument in which Lesman told McCreath that if he did not like the company rules, he could hand in his uniform. According to McCreath, Lesman ended the exchange by calling him a "fucking nigger" and storming out. McCreath was "stunned" by the slur, which made him feel inferior to Lesman, and concerned about continuing to work for him. He was so upset by the incident that he considered resigning. Though financial considerations prevented him from doing so, he did reduce the hours he worked. McCreath filed an incident report with Augis on November 6,

but received no response.[2] On November 15, he filed a complaint with the MCAD alleging that Lesman's comment and racially motivated differential treatment violated G. L. c. 151B.

A few weeks later, on December 11, 1999, the guard scheduled to work the shift after McCreath's reported that he could not come to work. McCreath called Augis to ask who would relieve him. When he had not received an answer by 4:45 P.M., he gave the Hammond Park maintenance supervisor his keys and told him that he had to leave for a 5:00 P.M. appointment. Leaving his post without a replacement violated a written Augis work rule,[3] and later that day, McCreath received notice that Augis had suspended him. Citing the incident, Augis ultimately terminated McCreath, who then expanded his MCAD complaint to allege that the termination was retaliatory.

The case proceeded to a public hearing on November 1 and 2, 2001. As the hearing began, the hearing officer entered an order prohibiting Augis from calling Lesman as a witness because she found that Augis had acted in bad faith by requiring a subpoena before it would produce Lesman for a deposition. The hearing officer also prohibited Augis from calling its president and chief executive officer, John Augis, as a witness because she found that Augis had given McCreath inadequate notice of its intent to do so.

Substantively, the hearing officer found that Lesman had used

---

[2]In his report, McCreath stated:

"At approximately 9:30 P.M. I came back from the boiler room in #10 and saw Neil the supervisor at the office. I said hello to him and he started to ask me a lot of questions about visitor parking and ticketing. I explained the procedure to him as best as I could. Then after a couple minutes the phone rang twice then he started to tell me not to use the phone for personal calls. I asked him if he was sure that it was personal calls or he was assuming. Then I went on to say that if I need to call my home I am going to do so. He started to yell and said that if I don't like the rules I should pack up my uniforms and give them back to Ernie. At this point I was getting upset and so was he, he walked towards the door and said 'fucking nigger.' He slammed his car door and sped off. The following day I called Roy twice to complain, but on both occasions he said he was very busy and asked me to call back. Neil has been constantly harassing me ever since I started to work for [Augis]."

[3]The rule provided that "[i]f a guard is scheduled to relieve you, you cannot leave the guard site until that person is on site."

the racial slur McCreath alleged and that Augis had violated G. L. c. 151B, § 4, because Lesman's slur constituted "racial harassment" producing an "abusive working environment." She found that McCreath's report put Augis on notice of Lesman's conduct and that Augis took no remedial action. However, she found that McCreath did not establish discrimination based on disparate treatment or retaliatory termination. She awarded him $10,000 in emotional distress damages, $31,710 in attorney's fees, and $2,008 in costs, and she ordered Augis to hold a management training program on racial discrimination and harassment.

On September 17, 2003, the MCAD affirmed the hearing officer's award but reduced the award of fees and costs to a total of $17,863.[4] Augis subsequently sought review in the Superior Court, where a judge affirmed the MCAD's decision and awarded Mc-Creath an additional $8,400 in fees in connection with the appeal to the Superior Court.[5]

On appeal, Augis contends that (i) the hearing officer's award violated its right to due process by excluding evidence; (ii) "racial harassment," which was the language used in McCreath's complaint, is not discrimination prohibited by G. L. c. 151B, § 4, and neither McCreath nor the MCAD charged Augis with creating a hostile work environment; (iii) it was error to base liability for discrimination on a single incident; and (iv) the record did not contain substantial evidence to support the damages award for emotional distress.

---

[4]The MCAD reduced the hearing officer's fee award by fifty percent, stating that one-half of the time McCreath's attorney spent on the case was attributable to claims on which McCreath did not succeed. See generally *Killeen* v. *Westban Hotel Venture, LP*, 69 Mass. App. Ct. 784, 792-793 (2007).

[5]Augis's Superior Court complaint demanded both a de novo jury trial, see *Lavelle* v. *Massachusetts Commn. Against Discrimination*, 426 Mass. 332 (1997), and judicial review under G. L. c. 30A. While the case was pending, the Supreme Judicial Court decided *Stonehill* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 549 (2004), which overruled *Lavelle* in part and eliminated Augis's jury trial option. Here, Augis makes a passing claim of prejudice based on retroactive application of *Stonehill*. The claim is foreclosed by *Stonehill* itself, where the court said that the "retroactive effect of [its] decision . . . [would] be given to all cases that are still on direct review," reasoning that "[p]rinciples of equity and fairness dictate that complainants who have been found by the full commission to have been illegally discriminated against not be forced to relitigate their claims in the Superior Court." *Id.* at 569.

*Discussion.* a. *Exclusion of evidence.* As noted, at the outset of the hearing, the MCAD hearing officer prohibited Augis both from calling Lesman to testify about his interactions with Mc-Creath and from calling John Augis to testify about Augis's response to McCreath's complaint. Augis claims that the exclusion order denied its right to due process of law.

The order barring Lesman's testimony was a sanction for what the hearing examiner found was Augis's bad faith interference with McCreath's effort to obtain discovery. That finding is rooted in an order entitled "Commission Complaint and Order for Certification to Public Hearing" (certification order) that the MCAD's investigating commissioner issued on July 23, 2001. The certification order set a discovery deadline of September 15, 2001, and provided that "Neil Lesman's deposition will be conducted no later than" that date. The order mentioned Lesman because he was a key witness whom Augis had listed in a joint certification memorandum the parties had filed earlier. In the memorandum, Augis gave Lesman's address as "c/o Elite Protective Services."

Counsel for McCreath initially noticed Lesman's deposition, along with the deposition of Augis[6] and of McCreath's coworker Aaron Cribbs, for June 12, 2001, but she then canceled both depositions. The deposition notices stated that the address of Lesman and Cribbs was "Elite Protective Services, 255 Commandant's Way, Chelsea, MA 02150," and the record contains no suggestion, contemporaneous or other, from Augis that the address was inappropriate.

On August 2, 2001, a few days before the MCAD issued an order that the case would proceed to a hearing on November 1 and 2, counsel for McCreath issued a notice of Lesman's deposition for September 11, 2001. Shortly before September 11, counsel for Augis canceled the date because of an illness, but Lesman, unaware of the cancellation, appeared without a subpoena, evidently having been instructed by counsel for Augis to do so. No deposition took place.

Insofar as the administrative record is concerned,[7] neither party immediately rescheduled the depositions. Instead, the par-

---

[6]The Augis deposition was analogous to the deposition of a party contemplated by Mass.R.Civ.P. 30(b)(6), 365 Mass. 780 (1974).

[7]The record before the Superior Court contained a facsimile transmission from Augis's counsel to McCreath's counsel dated September 24, 2001, stat-

ties jointly moved on October 16, 2001, to continue the November 1 and 2 hearing dates because McCreath had not completed depositions of the Augis witnesses he wanted to depose and would not be able to do so by November 1. The hearing officer denied that motion on October 18.

On Monday, October 22, 2001, McCreath's counsel mailed counsel for Augis two notices of deposition, one for Lesman and one for Cribbs, both of which were scheduled for the following Monday, October 29. The notices prompted a telephone call from Augis's counsel, a lawyer other than the one who had been handling the matter from the outset, but a member of the same firm. In the telephone call, Augis's attorney said that neither Lesman nor Cribbs would appear for a deposition without a subpoena.[8] He followed that telephone call with a letter dated October 26, the Friday before the scheduled depositions, reiterating the same position.[9] Counsel for McCreath issued no subpoenas but instead filed a motion in limine to preclude Lesman's testimony.

The circumstances surrounding the order barring John Augis's testimony begin with a "position statement," essentially a response to McCreath's complaint that counsel for Augis filed on December 10, 1999. See 804 Code Mass. Regs. § 1.10(8) (1998). In that statement, counsel said that Augis intended to call as witnesses three individuals, Lesman, Cribbs, and its general manager, Tom

---

ing that she had recovered from her illness, was prepared to move forward, and asking for new deposition dates. Because that facsimile transmission was not in the record of proceedings before the MCAD, we do not consider it. See *David* v. *Commissioner of Ins.*, 53 Mass. App. Ct. 162, 165 (2001) (review under G. L. c. 30A is "confined to the record of administrative proceedings").

[8]Title 804 Code Mass. Regs. § 1.14(3) (1999), states: "Following Certification to Public hearing . . . counsel for any party may issue subpoenas pursuant to [G. L.] c. 30A, § 12." Section 12(3) of G. L. c. 30A, inserted by St. 1954, c. 681, § 1, states: "Any party to an adjudicatory proceeding shall be entitled as of right to the issue of subpoenas in the name of the agency conducting the proceeding. The party may have such subpoenas issued by a notary public or justice of the peace, or he may make written application to the agency, which shall forthwith issue the subpoenas requested." Subpoenas, therefore, are obtained quite easily, although by no means instantly. Obtaining proper service, of course, may present far more complicated problems.

[9]Counsel's letter stated, in part, "I am sorry that you were apparently confused by [prior counsel's] willingness to discuss scheduling and availability, when you attempted to take depositions at an earlier date, in a courteous attempt to facilitate your discovery."

Healy, although it characterized the list as "preliminary" and reserved its right to amend it. In the joint certification memorandum, which was dated July 13, 2001, McCreath listed four witnesses in addition to himself, and Augis listed Lesman and Healy. Both parties reserved their right to amend the lists.

The investigating commissioner incorporated the joint certification memorandum in his July 23 certification order where, in addition to setting the deadline discussed earlier, he ordered McCreath to "produce a complete list of his witnesses, including names and addresses and the substance of their testimony, by August 17, 2001." He imposed no similar obligation on Augis.

Counsel for McCreath did not comply with the certification order until October 15, 2001, when she sent by facsimile transmission to counsel for Augis a list containing the names of two witnesses and the other required information. One of the two names had not appeared in any earlier filing or correspondence. In response, Augis sent counsel for McCreath its witness list by letter dated October 26, 2001, substituting John Augis for Healy.[10]

On that record, the MCAD hearing officer barred Augis from calling either Lesman or John Augis as a witness. Insofar as Lesman is concerned, she noted that the certification order required the parties to depose Lesman "on or before September 15, 2001," and that, although Lesman had appeared on September 11, counsel for Augis had not. Subsequent attempts to depose Lesman failed, she found, "because of [Augis's] sudden refusal to produce him without subpoena." As for John Augis, the hearing officer barred both sides from calling witnesses whose names appeared for the first time on the lists counsel exchanged shortly before the hearing.

In considering Augis's claims regarding exclusion of Lesman's testimony, we keep in mind that if the MCAD's "interpretation of its regulations and statutory mandate is rational, and adhered to consistently, it should be respected." *Boston Police Superior Officers Fedn.* v. *Boston*, 414 Mass. 458, 462 (1993). Moreover, regulation of the administrative discovery

---

[10]In a posthearing letter to the MCAD hearing officer, Augis asserted that Healy had left Augis suddenly, a month before the hearing and that, as a consequence, it had substituted John Augis to give essentially the same testimony.

process lies within the sound exercise of the hearing officer's discretion, just as regulation of the discovery process in judicial proceedings lies within the sound exercise of judicial discretion. See, e.g., *University Hosp., Inc.* v. *Massachusetts Commn. Against Discrimination*, 396 Mass. 533, 536-538 (1986). Compare, e.g., *Mattoon* v. *Pittsfield*, 56 Mass. App. Ct. 124, 131-133 (2002).

In excluding Lesman's testimony, the hearing officer appeared to be applying 804 Code Mass. Regs. § 1.19(5) (1999), which states that "[i]f a party or person from whom discovery is sought fails to comply with an Order for discovery . . . a party . . . seeking discovery may apply to the Commission to make such Orders in regard to the failure of discovery as are just." Here, the relevant order required completion of any deposition of Lesman by September 15, 2001. Counsel for McCreath attempted to comply with that order but the illness of counsel for Augis prevented her from doing so. Thereafter, as evidenced by their joint motion for a continuance, both counsel appear to have thought that the best course was to seek a continuance of the hearing. When that effort failed, counsel for McCreath attempted to obtain the discovery she would have had by the deadline but for the illness of Augis's counsel. At that point, Augis suddenly decided that it was time for hardball.

The hearing was imminent. For almost two years, Augis had given no indication that witness subpoenas were required for the deposition of its own employees. In filings with the MCAD, it had given its own address as the address for its employee witnesses. It had raised no objection to deposition notices using that address. It had manifestly instructed Lesman to appear without a subpoena for the September 11, 2001, deposition. Then, the week before the hearing, it decided that subpoenas would be necessary and gave no assurance, at least so far as the record reveals, that it would honor the subpoenas, make its employees available to receive service, or provide its employees' home addresses.

Under those circumstances, we think that the hearing officer could conclude that Augis acted in bad faith and could prohibit Lesman's testimony as a sanction for Augis's failure to cooperate to remedy the problem it had created when the illness of its attorney prevented McCreath's attorney from complying with the discovery deadline she otherwise would have met. See gen-

erally *Mattoon* v. *Pittsfield*, 56 Mass. App. Ct. at 128-133. A party that frustrates, innocently or otherwise, another party's ability to comply with a discovery deadline has an obligation to cooperate in repairing the damage and cannot with impunity seek to capitalize on the problems its own conduct created.

The order precluding John Augis's testimony presents greater difficulty. Although McCreath was under an order to provide a witness list and a summary of witness testimony, no such order applied to Augis. Despite the fact that Healy's name had been on Augis's witness list from the very beginning, counsel for McCreath never attempted to obtain discovery from him after the notices for the June 12, 2001, deposition. McCreath's own witness list was delivered at the eleventh hour and well past the applicable deadline.

Whatever doubts we may have about the propriety of precluding testimony from John Augis under those circumstances, we think that the preclusion order was harmless. Augis intended to have John Augis testify as to two subjects, i.e., that McCreath's termination was neither retaliatory nor discriminatory and that Augis was unable to determine whether the incident about which McCreath complained in fact took place. The hearing officer and the MCAD found in Augis's favor on the first issue without testimony from John Augis. The damages award was based on Lesman's conduct, not on Augis's knowledge of that conduct. The portion of the order requiring training for Augis supervisors was warranted by Lesman's conduct and would have been warranted by evidence that, when confronted by an allegation of conduct as profoundly offensive as Lesman's, Augis chose to do nothing because it could not determine precisely what had happened. In sum, we think that the hearing officer's preclusive orders did not deprive Augis of any substantial rights.

b. *The basis of liability.* Augis's second claim is that the MCAD's damages award rested on a form of discriminatory conduct with which it had not been charged. More specifically, Augis alleges that the complaint charged it with wrongfully terminating McCreath but the MCAD, after determining that there had been no wrongful termination, imposed liability because of a "hostile work environment," a claim no one had ever made.

The record paints a different picture. In his complaint to the MCAD, McCreath alleged that he had been "the victim of dif-

ferent terms and condition[s] in the facility where [he] work[ed] because of [his] race and color." As an example of that different treatment, McCreath stated that "[o]n November 3, 1999, [Lesman] called me a 'f . . . g nigger.' "

An MCAD investigator stated that "the gravamen of [McCreath's] complaint is that the supervisor, Neil Lesman, used racially derogatory language directly toward the black employees, and specifically towards him." The investigator found evidence supporting that allegation and concluded that there was probable cause "for crediting the allegations of the . . . complaint."

Later, in the parties' joint certification memorandum, McCreath's counsel stated that McCreath alleged, among other things, that Lesman had called him a "nigger" and that, after he complained, he was singled out for discriminatory treatment for minor workplace violations. One of the four issues as to which counsel sought certification was whether Augis, through Lesman, "unlawfully discriminated against [McCreath] when [Lesman] voiced racial epithets and displayed hostilities toward [McCreath] and other African-American security guards." Still later, in his certification order, to which a copy of McCreath's complaint was attached, the investigating commissioner said that a public hearing was required on three issues:

> "1) Whether [McCreath] was subjected to different terms and conditions of employment by reason of his race, when he was singled out in an unusually harsh and unjust manner for alleged job infractions.
>
> "2) Whether [McCreath] was unlawfully terminated by his supervisor Neil Lesman on account of his race.
>
> "3) Whether [McCreath] suffered damages from emotional distress and lost wages on account of the alleged disparate treatment and termination."

From the outset, then, McCreath's allegation that he was singled out for harsh treatment because of his race was a visible, central component of his over-all claim. To be sure, wrongful termination was also an issue in the case. But Lesman's alleged use of a racial epithet and the extent of the resulting harm were always issues on center stage. The damages award was not based on uncharged conduct.

c. *Sufficiency of the evidence.* Augis's claim regarding sufficiency of the evidence is based on an assertion that a single instance of discriminatory conduct is not sufficient to prove the kind of racial discrimination prohibited by G. L. c. 151B. As Augis frames the argument,

> "[a] claim of racial harassment must [rise] to the level of actionable job discrimination in order to be covered under the anti-discrimination law. If the actions alleged to be racial harassment do not [rise] to this level the only cause of action afforded to a complainant are the torts of negligent and intentional infliction of emotional distress. It is well settled law that actions for negligent and intentional infliction of emotional distress against an employer are barred by the exclusivity clause of the Workers' Compensation Act."

The first sentence of that argument is circular, for it improperly assumes a clear distinction between "racial harassment" and "actionable job discrimination." There is none. Instead, "harassment is actionable if it '[i]s sufficiently pervasive to alter the conditions of [the victim's] employment.' " *Gnerre* v. *Massachusetts Commn. Against Discrimination*, 402 Mass. 502, 507-508 (1988) (*Gnerre*), quoting from *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 162 (1987) (*College-Town*). "Actionable job discrimination" has no irreducible quantitative requirement that allows supervisors, for example, one free racial slur. Instead, "the more offensive the comments the fewer incidents of harassment may be required to demonstrate the objective reasonableness of the [discrimination] claim." *Gnerre, supra* at 508.[11]

We think that a supervisor who calls a black subordinate a

---

[11]Both *College-Town* and *Gnerre* involved claims of sexual harassment. Augis argues that the analysis those cases contain is not properly applied to claims of discrimination based on race. The Supreme Judicial Court, however, has found "no basis to review hostile work environment claims based on sexual harassment under a different standard from hostile work environment claims based on racial harassment." *Clifton* v. *Massachusetts Bay Transp. Authy.*, 445 Mass. 611, 616 n.5 (2005). Unlawful harassment, in other words, is unlawful harassment and there is no basis for using different analytical models to determine its existence in different contexts. Indeed, just last year, we looked to *Gnerre* for guidance in a case involving racial discrimination. See *Thomas O'Connor Constructors, Inc.* v. *Massachusetts Commn. Against*

"fucking nigger" has engaged in conduct so powerfully offensive that the MCAD can properly base liability on a single instance. That term inflicts cruel injury by its very utterance. It is degrading, it is humiliating, and it is freighted with a long and shameful history of humiliation, the ugly effects of which continue to haunt us all. The words have no legitimate place in the working environment — indeed, they have no legitimate place — and there is no conceivable justification for their use by a workplace supervisor.

Augis's liability for Lesman's conduct flows from the language of G. L. c. 151B, § 4(1), as appearing in St. 1989, c. 516, § 4, making it unlawful "[f]or an employer, by himself or his agent," to discriminate. Through use of that language "the Legislature intended that an employer be liable for discrimination committed by those on whom it confers authority." *College-Town, supra* at 165. Having found that Lesman was McCreath's supervisor and that he directed the epithet at McCreath, and understanding that "harassment by a supervisor carries an implied threat that the supervisor will punish resistance through exercising supervisory powers, which may range from discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment," *id.* at 166, there was substantial evidence to support the MCAD's finding that Augis was liable for discrimination of a type G. L. c. 151B, § 4, prohibits.

d. *Damages.* Augis's final argument is that the evidence was insufficient to support the MCAD's award of $10,000 in damages for emotional distress. Such an award must be supported by "substantial evidence of the emotional suffering that occurred, as well as substantial evidence of a causal connection between the complainant's emotional distress and the respondent's unlawful act." *DeRoche* v. *Massachusetts Commn. Against Discrimination*, 447 Mass. 1, 7 (2006). Although physical manifestations of the distress are not essential, the award's "factual basis must be made clear on the record." *Stonehill College* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 549, 576 (2004). Factors to consider include "(1) the nature and character of the

*Discrimination*, 72 Mass. App. Ct. 549, 560 (2008) (finding general contractor liable for racial remarks its supervisory employee made to employee of subcontractor).

alleged harm; (2) the severity of the harm; (3) the length of time the complainant has suffered and reasonably expects to suffer; and (4) whether the complainant has attempted to mitigate the harm." *Ibid.*

The hearing officer credited McCreath's testimony about the incident with Lesman. She noted that he was "stunned" by the racial slur. As Lesman left, McCreath "stood up and watched Lesman enter his car, and watched him until he disappeared out of sight. He then sat down for a while because he was so upset and hurt." The incident made McCreath "feel . . . inferior to Lesman and . . . concerned about having to face Lesman and continue working with him." He was "torn apart" by Lesman's outburst and continued to feel hurt by the incident to the day of the hearing. Those findings, all of which are firmly anchored in the record, provide substantial evidence for the MCAD's award of $10,000 in damages for emotional distress.

*Judgment affirmed.*