Nickerson, J.
This is an action brought by the owners of an inn to recover damages for an allegedly defective heating and air conditioning system purchased from, and installed by, the defendant. The case was tried, jury waived, on April 22, 23, and 26, 2004. Based on all the credible evidence the court enters the following findings of fact.
FINDINGS OF FACT
The plaintiffs Trevor Pinker and Stephen Mascillo own the land and buildings at 8 Cottage Street in Provincetown. The gentlemen purchased the premises in January 1998 with the intention of renovating the main building on the site to create a seven-room guesthouse now known as The Oxford. The plaintiffs use the second, smaller building at 8 Cottage Street as their residence.
The defendant, JSS Corp, Inc., is a Massachusetts corporation based in Orleans which does business under the name of Souza’s Refrigeration. JSS is a heating, air conditioning and refrigeration company whose principal officer and agent is John S. Souza. Souza has over twenty-two years experience as a heating and air conditioning contractor.
Immediately after taking title, Pinker and Mascillo began the renovation of the premises; stripping the interior walls to the partition framework or studs so as to allow for new wiring and heating and cooling equipment. They met with Souza to discuss their heating and air conditioning needs. The plaintiffs had specific aesthetic concerns. They did not want the equipment to mar the traditional architecture of the building inside or out, ruling out wall or window units. The three men discussed options and settled on a geothermal heat pump system similar to one JSS had successfully installed at another Provincetown inn. Indeed the performance of the already installed system at the Brass Key was an impressive selling point to the plaintiffs.
On February 25, 1998, JSS presented the plaintiffs with its written proposal for the work. (Ex. 1.) The proposal called for a geothermal heat pump system. Basically the system would draw water from a well to be drilled on the property. The water was to be piped into the buildings. The variance between the temperature of the ground water and the air would be used to heat or cool each room by means of a file-cabinet-sized heat pump in each guest room. The water would then be returned to the aquifer by means of a second well to be drilled on the premises. Each heat pump unit included a back-up electric heater to provide emergency heat if the geothermal system failed.
JSS quoted a total cost of $48,600 which included a $7500 allowance for drilling the two wells. The plaintiffs adopted the proposal and immediately gave JSS their deposit check for $24,000. Time was of the essence inasmuch as the plaintiffs wanted to complete the work and open for business by June 1998.
JSS met the plaintiffs’ work timetable. JSS procured Joseph Cappello of Wellfleet to drill the two wells. The plaintiffs neither hired the well driller nor paid his bill. JSS acted as a general contractor in this regard. While Souza asked Cappello if the well water was alright, Souza neither demanded nor received any water tests. Beyond Cappello telling Souza the water in the area was good, Souza did nothing to determine if the water was of sufficient quality to serve a geothermal heat pump system. Neither Souza nor Cappello were aware of any problems with the water quality at the site or in the area. A water test was done with a clean result by the well driller (not Cappello) before Souza installed a similar heat pump system at the nearby Brass Key guesthouse. Instead, Souza was focused on the quantity of the water, the sufficiency of the flow in gallons per minute to run the system. Souza failed to determine the quality of the water despite his knowing that the manufacturer of the heat pumps warned, in its product literature, of problems arising from operating the equipment with poor quality water.
Except for the issue of water quality assurance, JSS’s work was done promptly and in a workmanlike manner. The heat pump system was up and running *222 in time for the inn’s first guests. The plaintiffs were satisfied and paid JSS’s bill in full. The system was a so-called energy efficient system which earned the plaintiffs a $7500 rebate from the electric utility. Before paying the rebate, the utility inspected the system and approved it.
Early on, JSS repairmen were called to The Oxford to perform minor repairs consistent with the initial operation phase of any sophisticated building system. The property owners were obligated to maintain the system by checking and cleaning the intake water filter. (The water drawn from the supply well first passed through an intake filter in the basement of the main building.) Within the first year of use, the plaintiffs noticed a brown slimy substance appearing in the filter.[1] In 1998, the plaintiffs cleaned the filter every few weeks but by the spring of 2000 cleaning the filter was a daily chore.
The system performed appropriately until February 23, 1999, at which time a repairman discovered poor water flow in three of the heat pump units. After a repair all seemed fine until May 31, 1999, when a water flow valve malfunctioned. The repairman found the valve was “gunked up.” Late in the spring of 1999, the plaintiffs had Cappello install a larger pump on the supply well so that the well could service both the heating and cooling system and an irrigation system on the premises.[2] As the months passed, pipes were becoming occluded with a brown sludge. The heat pump’s components were also filling up with the debris. By March 2000 Cappello and Souza performed a water test that confirmed the presence of an iron precipitating bacteria. The brown slime first seen in the filter was in fact the earliest sign that the supply well was contaminated with the bacteria. The resulting sludge was to blame for the heat pump system’s malfunction.
JSS faithfully sent repairmen to the site as requested. Under the terms of the contract, JSS guaranteed the equipment installed “by a one-year parts and labor warranty.” In 2000, the plaintiffs invested in a maintenance contract with JSS. Late in the spring of 2000 Cappello redrilled the supply well seeking a deeper strata in an effort to tap into uncontaminated water. He also treated the discharge well with acid. Some improvement was noted. During the summer of 2000 the discharge well stopped accepting the used water from the system, leaving a sizable puddle in the inn’s parking lot. Cappello drilled a new return well. By the summer of 2001, the second return well was clogged and failing. The plaintiffs hired their own well man to advise them, a Mr. Gaday. He attempted to unclog the return well, without success.
During the winter of 2000-2001, the plaintiffs had to resort at times to using the back-up electric heaters. During the summer of 2001, the cooling system had to be augmented by three window air conditioners. The Oxford used the electric heat exclusively during the winter of 2001-2002. Window air conditioners were bought to service the entire guest house for the summer of 2002. In the fall of 2002 the plaintiffs abandoned the heat pump system altogether.
Clearly the iron precipitating bacteria caused the failure of the heat pump system. While the expert testimony at trial provided less than absolute scientific proof as to the source and extent of the contamination, the credible evidence at trial supports a finding that the iron precipitating bacteria was naturally present in the ground water at the site in early 1998. By tapping the aquifer and extracting the water, the bacteria was exposed to oxygen and flourished. If the well water had been tested in February 1998, the test would have revealed the presence of the bacteria.
A well plagued by iron precipitating bacteria is not incurable. The soils at the site are suitable for the rapid infiltration of the discharge water. The problem is that the bacteria produces a sludge which clogs the screen of the return well and the coils, valves and so forth in the heat pump system. Plaintiffs’ own expert opined at trial that a treatment system was feasible but he ventured no estimate of the cost of such a system. Treatment may be as simple as injecting bleach into the wells. The solution to the problem is most probably either chemical treatment of the wells and well water or mechanically surging and flushing the system periodically or a combination of the two. The plaintiffs never adequately explored and considered the chemical and mechanical treatment options. If those options failed, the system could be adapted to a closed loop geothermal system or a boiler/condenser system at a cost of approximately $30,000.[3] Again, the plaintiffs never adequately explored and considered such adaptations to the existing system.
This action was filed May 31, 2001 against JSS and Souza individually. By an amended complaint on November 26, 2001, Cappello Well Drilling and the heat pump manufacturer were added as defendants. JSS cross claimed against Cappello Well Drilling. The manufacturer apparently was never served. A settlement was reached with Cappello on both the complaint and cross claim, simply noted here as a procedural matter as opposed to something of evidentiary value. The counts against Souza individually have been dismissed.
The plaintiffs seek recovery under the second amended complaint against JSS on multiple theories: breach of contract, breach of express and implied warranties, negligent misrepresentation, fraud and violation of G.L.c. 93A, §§2 & 11. In their request for findings and rulings, plaintiffs recap their damages as follows: $52,100 for the cost of the heat pump system ($48,600 paid to JSS plus electric and carpentry bills of $11,000 paid directly by the plaintiffs, less the $7500 rebate), $3500 for the window air conditioners, $9000 for additional utility expense with the electric heaters over the course of three winters, $1553 for *223 Gaday’s services, $3046 for repairs by JSS not covered by warranty, $1304 for the JSS service agreement and $1520 paid to Cappello for a total of $72,023.[4] At trial, plaintiffs presented two widely ranging estimates to replace the heat pump system, one for $39,525 and the other for $118,955, both from the same heating and cooling contractor.
APPLICATION OF THE FACTS TO THE LAW
From JSS’s written proposal of February 25, 1998 and the surrounding conduct of the parties it is clear that a contract was formed. JSS undertook to furnish and install a geothermal heat pump system to heat and cool The Oxford and the plaintiffs’ residence at 8 Cottage Street. The plaintiffs agreed to pay the quoted price of $48,600 and furnish the necessary associated electrical connections and carpentry work. Plaintiffs met their obligations.
Under the terms of the contract, it was the duty of JSS to provide for the installation of the two wells. This was done by Cappello, acting as JSS’s subcontractor. JSS is bound to perform its work in a good and workmanlike manner. Wolov v. Michaud Bus Lines, Inc., 21 Mass.App.Ct. 60, 64 fn.8 (1985). JSS failed to do so when it failed to secure a test of the well water and thereby breached the contract. By its breach of contract, JSS set in motion the natural agents that led to the heat pump system’s failure. Had the water been tested, the parties could have taken steps to treat the water or alter the heat pump system to accommodate the presence of bacteria in the aquifer.
Once the problem was diagnosed, the plaintiffs failed to mitigate their damages. A plaintiff in a contract action is obliged to take all reasonable steps that do not entail undue risk, expense or inconvenience in order to minimize damages. Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982), Krasne v. Tedeschi & Grasso, 436 Mass. 103, 109 (2002). The burden of proof falls on the defendant to demonstrate failure by the plaintiff to mitigate damages. McKenna v. Commissioner of Mental Health, 347 Mass. 674, 677 (1964). JSS has met its burden. The plaintiffs have failed to undertake basic steps to treat the bacteria problem. They cannot come into court and expect compensation for more elaborate cures.
On the breach of contract the plaintiffs are entitled to their initial repair and evaluation expenses totaling $7473.[5] Further, they should recover the increased heating costs for two years ($6000) and their cost of the window air conditioners ($3500), bringing the total damages to $16,973. Any sums claimed beyond that figure must be denied inasmuch as the plaintiffs failed to mitigate their damages and failed to prove either the probable cost of treatment for the system or the probable need and cost of adaptations to make the system work properly. The credible evidence suggests that if treatment efforts fail the heat pump system can perform adequately with appropriate adaptations.
Plaintiffs’ warranty claims provide no greater recovery. The only express warranty made by JSS was to use high quality materials, to promptly install the materials in a neat, workmanlike manner and to provide one year’s coverage as to parts and repairs. JSS did not breach the express warranty. No evidence exists suggesting that JSS guaranteed the quality of the well water. No inference of a warranty arises from the facts found.
The plaintiffs seek to recover on the implied warranties connected to the sale of goods under G.L.c. 106, §§2-314 & 2-315. Clearly there is no implied warranty for a particular purpose because no particular or subjective purpose was envisioned by the parties. Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 821 (1982). Moreover, the transaction at hand does not involve the sale of goods, hence the implied warranties under §§2-314 & 2-315 do not apply. Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 141 (2002). Where a contract is for both sales and services, one must determine which is the predominant factor, thrust or purpose of the contract. Id. JSS’s invoice (ex. 2), is of some help for it shows that labor and well drilling charges exceeded the cost of materials almost two to one. The goal of the contract is to improve the buildings affixed to the real estate at 8 Cottage Street. Such a contract does not constitute a sale of goods. See White v. Peabody Construction Co., Inc., 386 Mass. 121, 131-33 (1982). Plaintiffs’ reliance on Commonwealth v. Johnson Insulation is misplaced, for in Johnson the question of goods versus services was not pursued on appeal. Commonwealth v. Johnson Insulation, 425 Mass. 650, 653 fn.5 (1997). Even if this is a sale of goods, the implied warraniy of merchantabiliiy adds nothing to plaintiffs’ case as the heat pump system would be fit for its ordinaiy purposes if the plaintiffs only undertook to treat the well water. See Hannon v. Original Gunite, 385 Mass. at 822. It would be inappropriate to permit plaintiffs a broad warranty-based recovery in this action while turning a blind eye to their failure to take appropriate corrective measures.
The ancillary counts in the second amended complaint fare no better. In February 1998, Souza knew that the well water at the Brass Key had passed inspection. He failed to appreciate that the well water at 8 Cottage Street could be different. His acts and omissions give rise to nothing more than a finding against JSS for a failure to perform under the contract in a workmanlike manner. The claim for negligent misrepresentation fails on the facts. There is no evidence of fraud. Moreover, JSS did not engage in any unfair or deceptive acts or practices in violation of G.L.c. 93A.
*224 ORDER
For the above cited reasons, it is ORDERED that JUDGMENT enter for the plaintiffs against JSS Corp., Inc., on Count IV of the second amended complaint in the sum of $16,973 plus interest from the date of the filing of this action and costs and that the remaining counts of said complaint and all cross claims be DISMISSED.

The court does not credit Pinker’s testimony that the brown film was present in the filter from the very start of the system’s operation.

 initially JSS looked to the change in pump capacity as the reason debris was turning up in the heat pump system. There was no credible evidence at trial to suggest that the change in pumps or the irrigation system played any role in the failure of the heating and cooling system.

The heat pump manufacturer recommends the use of a closed loop system in areas with iron precipitating bacteria. A vertical configuration of a closed loop system would be necessary given the size of the lot at 8 Cottage Street.

Plaintiffs’ request for findings and rulings varies in the total, apparently due to math errors in adding the consequential damages and in calculating the net cost of the system.

 The total of $7473 includes $1553 — Gaday, $3096 — JSS, $1304 — JSS, and $1520 — Cappello.