ORRINA TURNER *vs.* COMMUNITY HOMEOWNER'S
ASSOCIATION, INC.[1]

No. 02-P-1328.

Suffolk. December 8, 2003. - October 21, 2004.

Present: PERRETTA, KANTROWITZ, & BERRY, JJ.

*Contract,* Lease of real estate, Option. *Landlord and Tenant,* Option to
purchase. *Real Property,* Option.

In a civil action brought by a lessee alleging that she had an enforceable lease
agreement with the defendant that gave her an option to purchase the
leased property, a Superior Court judge properly denied the plaintiff les-
see's motion for summary judgment, where the lessee failed to carry her
burden of showing that the undisputed facts established the existence and
terms of such an agreement [324-325]; further, the judge erred in granting
the defendant's motion for summary judgment, where there existed a mate-
rial disputed question of fact whether the plaintiff lost any right to exercise
the option [325-327].

In a civil action brought by a lessee alleging that she had an enforceable lease
agreement with the defendant that gave her an option to purchase the
leased property, an earlier agreement for judgment entered by the parties in
a related Housing Court action did not have preclusive effect on the issue
of the plaintiff's attempt to exercise her option to purchase the property,
because it was expressly exempted from that agreement; further, the
doctrine of claim preclusion did not bar the plaintiff from presenting the
claim [327-328].

CIVIL ACTION commenced in the Superior Court Department on
May 1, 2000.

The case was heard by *Carol S. Ball,* J., on motions for sum-
mary judgment.

*James E. Small, Jr.,* for the plaintiff.

*Arthur L. Johnson* for the defendant.

PERRETTA, J. Orrina Turner brought this action against Com-
munity Homeowner's Association, Inc. (Community), seeking

---

[1]As is our custom, we use the name of the defendant as it appears in the
caption of the complaint.

an order declaring that she had an enforceable lease agreement with Community which gave her an option to purchase the leased property. On cross motions for summary judgment, the judge ruled that, because Turner was indisputably in breach of any existing lease agreement, she had no enforceable right to purchase the property. She denied Turner's motion and granted that of Community. On Turner's appeal, we conclude that whether Turner lost any right to exercise the option to purchase provided for in the lease agreement turns on disputed questions of fact and reverse the judgment.

1. *The undisputed background facts.* Attempting to stave off eviction from her home after the Federal National Mortgage Association (Fannie Mae) (FNMA) foreclosed the mortgage on her property, Turner sought help from Community, a nonprofit organization that assists people with unfavorable credit histories in maintaining ownership of their homes. She and Community settled on a plan designed to allow her to remain in her home, repair her credit rating, and regain ownership of her property: Community would purchase the property from Fannie Mae and then enter into a lease agreement with Turner, the terms of which would include a provision affording her an option to purchase the property.

Consistent with this strategy, Community purchased the property in question from FNMA on or about June 18, 1997, for $65,000. The purchase was financed by a loan from Crossland Mortgage Corporation (Crossland) in the amount of $71,437.[2] The loan was secured by a mortgage on the property. In addition, Turner paid Community $5,000 to be used with respect to its purchase of the property.[3] After Community purchased the property from FNMA, Turner continued to reside in her home

---

[2]Community procured the loan from Crossland through the United States Department of Housing and Urban Development's 203(k) Rehabilitation Mortgage Program, a program which requires that a minimum of $5,000 of the mortgage loan proceeds be devoted to improving the purchased property.

[3]Community has made various representations concerning the purpose of this payment: (1) "to insure the performance of the Turners pursuant to the . . . lease"; (2) in consideration of [Community's] agreement to use its credit, its access to Federal Housing Authority mortgage insurance, and its willingness to enroll the Turners in its "hardship lease to own program"; and (3) "to cover the closing costs" associated with its purchase of the property.

as Community's tenant. Sometime thereafter, however, the landlord-tenant relationship appears to have soured.

On December 14, 1999, Community served Turner with a notice to quit for failure to pay rent for the months of July through December of that year, and in January, 2000, brought a summary process action in the Boston Housing Court. Turner responded by commencing this suit in Superior Court in May, 2000, against Community, seeking a declaration of her rights with respect to the property, offering to pay the purchase price of her property, and asking that Community be ordered to perform its obligation under the option to purchase provisions of its agreement with her.

While the Superior Court action was pending, Turner and Community entered into an agreement for judgment, dated June 12, 2000, in Community's action for summary process. Their agreement was entered as an order of the Housing Court on that action.

*2. The documentary evidence.* In support of her motion, Turner offered two versions of a document entitled "Agreement for Lease with Purchase Option" as evidence of her agreement with Community.[4] Both of these documents, respectively dated May 30, 1997, and July 1, 1997, were prepared and signed by Community but not by Turner. Because the terms and language of these two documents are substantially similar, we refer to them collectively as the "agreement" while noting any dissimilarities.

The terms of the agreement allowed Turner to lease the property with an option to purchase it by her assumption of Community's mortgage.[5] The agreement specified that Turner was to pay Community rent, on the first day of each month,

---

[4] Turner also served up a third agreement, dated April, 1997, the terms of which called for her and Community to execute a "mutually agreeable and commercially reasonable Single Family Dwelling Lease with an Option to Purchase," the form of which was to contain certain specifically expressed covenants. While perhaps illuminating on the issue of the intent of Turner and Community in respect to the documents of subsequent dates, it is no more than an agreement to enter into a lease containing an option to purchase at a future date and does not give rise to any binding obligations. See *Riedel* v. *Plymouth Redev. Authy.*, 354 Mass. 664, 665-666 (1968).

[5] More specifically, the agreement provides that Community grants to Turner an option to "[p]urchase real property . . . acquired by [Community], by as-

until her assumption of Crossland's mortgage and her exercise of the purchase option.[6]

Section 3(l) of the May 30 version of the agreement provides that Turner "understands and agrees that [her] failure to . . . make required payments on time to [Community] will, at [Community's] sole and exclusive option, terminate th[e] Lease, Option Period, and the Purchase Option."[7] This section of the agreement also entitled Turner to written notice of "potential or actual deficiencies or default" and a thirty-day opportunity to cure, after which Community would have the right to terminate the entire agreement. Also, section 3(n) provides that "[n]otwithstanding subsection (m) above [provision concerning eviction upon termination of the agreement] and without limiting [Community's] options with respect to occupancy, [Community] agrees that [Turner] may elect to purchase the property by tendering all sums necessary to satisfy the mortgage, outstanding title liens, and [Community's] expenses to date, within forty-five (45) days after receipt of the above [subsection l] notice."

While Turner's action in the Superior Court was pending, and as noted in part one of this opinion, *supra*, Turner and Community stipulated to and agreed upon the terms of a judgment,

---

sumption of [Community's] mortgage and transfer of [its] ownership rights," that, in order to assist Turner to become qualified under Crossland's assumption and credit requirements, Community would lease the premises to Turner during the specified option period (thirty-six months, presumably from the date the parties entered into an agreement) in accordance with the terms of a supplemental lease agreement, the terms of which were acknowledged to be integral "to the intent and expectations of the parties" and which were incorporated into and made part of the agreement. These provisions are found in the May 30 version of the agreement. A copy of this supplemental lease agreement has not been included in the record appendices. In any event, a provision parallel to that provided for in the May 30 version of the agreement is set out in section 2(c) of the July 1 version wherein Community agreed to lease the property to Turner to assist her to become qualified under the credit requirements of the Federal Housing Authority.

[6]Under the May 30 version of the agreement, the monthly payments were set at $786, whereas the amount set under the July 1 version was $975. The discrepancy between the two amounts is likely attributable to whether they include an administrative and/or management fee.

[7]The parallel provision of the July 1 version of the agreement provides that failure to make the monthly payments timely could result in a termination of the lease "at [Community's] sole and exclusive discretion."

dated June 12, 2000, in Community's summary process action in the Housing Court. According to the terms of their agreement for judgment, Community was entitled to possession of the premises and damages in the amount of $6,725.16, Turner could continue to occupy the premises so long as she made timely rental payments, further summary process proceedings were to be stayed pending the outcome of Turner's action in the Superior Court and, at the conclusion of the Superior Court action, either she or Community could move to modify or vacate their agreement for judgment for purposes of resolving certain issues which they therein reserved for further litigation, including the issue of possession.

3. *The motions for summary judgment.* Based on her review of the various documents attached to the motions, the Superior Court judge denied Turner's motion on the stated basis that "multiple partially signed agreements exist" raising factual questions as to the existence and terms of any enforceable contract between the parties. In ruling on Community's motion, the judge took the facts in the light most favorable to Turner, construed the agreement as a single, integrated agreement providing for an option to purchase "contingent upon compliance" with the terms of the lease, determined that the agreement for judgment entered in the Housing Court precluded Turner from litigating in the present action the issue of any breach by her of any binding agreement,[8] and concluded that, because Turner was in breach of any agreement with Community that could be found to exist, Community was entitled to judgment on its motion.

4. *The arguments on appeal.* Turner argues that in ruling on the cross motions for summary judgment, the judge disregarded evidence showing that she had attempted to exercise her option to purchase prior to the events which gave rise to the summary process action, see note 9, *infra,* and failed to consider whether

[8]Each party claims the other was in breach of the terms of the agreement. While Community alleges that Turner was chronically delinquent in her rental payments and never paid for its management fees or her utilities, Turner claims that there were instances in 1998 and 1999 when the amounts credited by Crossland as mortgage payments were less than the amounts she in fact tendered to Community in payment of her monthly rental obligation.

Community had improperly rejected her exercise of her option to purchase.

Pointing to the fact that neither version of the agreement was signed by Turner, Community's position is that there is nothing to show the existence of a mutually assented to agreement as an operative instrument[9] or that Turner had timely attempted to exercise any option to purchase the property pursuant to the terms of those "inoperative" agreements.[10] Community also relies on the agreement for judgment entered in the Housing Court as conclusively establishing that Turner was in breach of any agreement by reason of her failure to comply with a condition to the exercise of the option to purchase, that is, her timely payment of rent.

5. *Discussion.* a. *Turner's motion.* To carry her burden on her motion for summary judgment, Turner was required to show that the undisputed facts established the existence and terms of an enforceable contract providing her with an option to purchase the property in question. The various and partially executed documents offered by Turner and opposed by Community with a sworn claim of an oral agreement based on somewhat different terms present genuine issues of material facts, the determination of which involves the weighing of disputed evidence in order to ascertain the parties' intent as to the operative effect of the May 30 and July 1 agreements. See *Goldstein* v. *Katz*, 325 Mass. 428, 430 (1950) (where evidence is disputed,

---

[9]But see 4 Corbin on Contracts § 12.11, at 57 (rev. ed. 1997) ("If one who has not signed any memorandum brings suit to enforce the contract as signed by the other party, the contract is made equally enforceable against the plaintiff").

[10]Turner alleged in her original verified complaint that she had made attempts to exercise her option to purchase in May, 1999, if not earlier, that is, all prior to the date of Community's notice to quit, December 14, 1999. We also note that included in the record appendix is a copy of a letter from Community to an Assistant Attorney General, dated June 9, 1999. In that letter, Community explained that under regulations promulgated by the United States Department of Housing and Urban Development, Turner was not qualified to assume the mortgage on the property in question. As explained by Community, Turner was in default of her lease obligations. Consequently, Community could not permit Turner to receive a financial "windfall," that is, the difference between the outstanding balance on the mortgage and the current fair market value of the property. Community was, however, willing to sell the property to Turner for its then fair market value.

ascertaining terms of oral agreement presents question of fact); *Madden* v. *Estin*, 28 Mass. App. Ct. 392, 395 (1990) (summary judgment seldom lies when intent is basis of dispute between parties). We see no error in the judge's denial of Turner's motion.

b. *Community's motion.* An option is an irrevocable offer to enter into a contract. See *Stapleton* v. *Macchi*, 401 Mass. 725, 729 n.6 (1988). Upon an effective acceptance of the offer, that is, upon the exercise of the option, the offer ripens into a bilateral contract for the purchase and sale of the property that is the subject of the option. See *Roberts-Neustadter Furs, Inc.* v. *Simon*, 17 Mass. App. Ct. 262, 265 (1983).

Assuming that a binding lease with an option to purchase agreement between Turner and Community existed, we do not agree with the judge's determination that the terms of such an agreement provided that Turner's exercise of her option to purchase was expressly conditioned on her being current in her rental payments. Our conclusion rests on the pertinent language set out in the following five clauses of the agreement:

(1) *Section 2(a)*: "Except as herein qualified or limited, [Community] hereby grants to [Turner] an irrevocable Option to Purchase real property . . . by assumption of [Community's] mortgage and transfer of [Community's] ownership rights in the . . . property."

(2) *Section 2(c)*: "[Community] agrees to lease the premises to [Turner] during the Option Period . . . which lease . . . is integral to the intent and expectation of the parties."

(3) *Section 3(l)*: "[Turner] understands and agrees that [her] . . . failure to make required payments on time to [Community] will, at [Community's] sole and exclusive option, terminate this Lease, Option Period and the Purchase Option. [Turner] will be given written notice by [Community] of potential or actual deficiencies or default, and if such are not remedied by [Turner] within thirty days, or within such other time as agreed by [Community] to insure assumption within the Option Period, [Community] reserves the right, *at [Community's] sole and*

*exclusive option, to terminate this agreement in full and require [Turner] to vacate the premises"* (emphasis supplied).

(4) *Section 3(n):* "[Turner] may elect to purchase the property by tendering all sums necessary to satisfy the mortgage, outstanding title liens, and [Community's] expenses to date, within forty-five (45) days after receipt of [the notice required under § 3(*l*)]."

(5) *Section 4(b):* "[Turner's] failure to make on time payments is a cause for termination of this Agreement."

As we read these provisions, Community reserved to itself the power to decide whether it would terminate the lease and option to purchase agreement because of any default by Turner. Compare *Derman Rug Co. Inc.* v. *Ruderman,* 4 Mass. App. Ct. 437, 440-441 (1976) (tenant allowed to extend lease "provided that Tenant is not in default of any of its obligations" under the current lease). That being so, Turner was entitled to exercise her option to purchase the property until such time as Community *chose* to terminate the agreement on the basis of Turner's nonpayment of rent and failure to cure her delinquency within thirty days notice of her default from Community. See *Atlantic Richfield Co.* v. *Couture,* 4 Mass. App. Ct. 230, 233-234 (1976); *Leisure Sport Inv. Corp.* v. *Riverside Enterprises, Inc.,* 7 Mass. App. Ct. 489, 492 (1979).

Based on Community's notice to quit which was served on Turner on December 14, 1999, the judge concluded that Turner had been given written notice that she was in default of her rental obligations for the months of July through December. Assuming that Turner in fact had failed to pay rent throughout that period, the lease and option to purchase agreement would have terminated, at the earliest, in January, 2000. However, and as earlier noted, Turner averred in her original verified complaint that she had attempted to exercise her option to purchase in May, 1999, months before Community's notice to quit, but that Community had refused to transfer the property to her. We think Turner's verified allegation finds support in Community's written explanation, dated June 9, 1999, to an Assistant Attorney General, as to why Turner was not qualified

at that time, June 9, 1999, to assume the mortgage on the property. See note 9, *supra.* Therefore, there is a material disputed question of fact as to whether Turner attempted to exercise her option to purchase the property prior to her default on her lease payments.

It follows from what we have said that neither Turner nor Community was entitled to summary judgment.

6. *Proceedings on remand.* It should be recalled that while Turner's present action was pending in the Superior Court, she and Community entered into an agreement for judgment on Community's summary process action in the Housing Court. The terms of the agreement for judgment, detailed in part two of this opinion, *supra,* essentially provided that Community was entitled to possession of the premises and damages in the amount of the arrearage owed by Turner for the months of July through December, 1999, that is, $6,725.16.

As an additional reason for allowing Community's motion for summary judgment, the judge concluded that the agreement for judgment precluded Turner from disputing her breach of the lease agreement which resulted in a forfeiture of her option to purchase. In the event the question arises in the proceedings on remand concerning whether the agreement for judgment entered in the Housing Court action has any preclusive effect, we consider the issue.

Restatement (Second) of Judgments § 27 (1982) provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or a different claim." *Cousineau* v. *Laramee,* 388 Mass. 859, 863 n.4 (1983). *Jarosz* v. *Palmer,* 436 Mass. 526, 530-531 (2002). However, comment e to § 27 of the Restatement provides that "[i]n the case of a judgment entered by . . . consent . . . none of the issues is actually litigated." Nonetheless, the consented to judgment "may be conclusive . . . with respect to one or more issues, if the parties have entered an agreement manifesting such an intention." As Turner and Community manifested an intent that their agreement for judgment would *not* be conclusive on any issue other than the amount of back rent that she might

owe, we conclude that it has no preclusive effect on her claim of right to exercise her option to purchase the property.

As we read the agreement for judgment, the question of Turner's attempt to exercise her option to purchase in May, 1999, was not put in issue in the Housing Court action. To the contrary, the parties expressly exempted that issue from their agreement. The agreement for judgment provides that the proceedings in the Housing Court were stayed pending the outcome of Turner's action in the Superior Court at the conclusion of which either she or Community could move to modify or vacate their agreed upon judgment for purposes of resolving any issues therein reserved for litigation, including Turner's right of possession to the property.[11]

Community also contends that because Turner could have raised her present claim in the Housing Court, the doctrine of claim preclusion prevents her from proceeding in the Superior Court. The argument fails. Community entered into the agreement for judgment with Turner while her action in the Superior Court was pending and, therefore, with knowledge of her allegation that she had the right to exercise her option to purchase the property in question. For a discussion of the doctrine of claim preclusion as it relates to parties' consent to separate litigation of related claims, see *Heacock* v. *Heacock*, 402 Mass. 21, 23 (1988); *Diversified Mort. Investors* v. *Viking Gen. Corp.*, 16 Mass. App. Ct. 142, 147-148 (1983); *Gloucester Marine Rys. Corp.* v. *Charles Parisi, Inc.*, 36 Mass. App. Ct. 386, 391 (1994). See also Restatement (Second) of Judgments § 26(1)(a).[12]

7. *Conclusion.* The judgment entered on Community's mo-

---

[11]The terms of the agreement for judgment were conditioned on Turner remaining current in her monthly payment obligations to Community. A review of the docket in the summary process proceeding shows that an execution issued in August of 2003. That execution of which neither party informed us does not, however, affect our analysis.

[12]Nor do we find anything in our procedural rules to support Community's argument of claim preclusion. According to Rule 5 of the Uniform Summary Process Rules, "Counterclaims shall not be considered compulsory; that is, they shall not be considered waived for the purpose of a separate civil action or actions if not asserted in a summary process action." Also, Mass.R.Civ.P. 81(a)(1)(7), as appearing in 423 Mass. 1412 (1996), expressly exempts summary process actions from the Massachusetts Rules of Civil Procedure. See

tion for summary judgment is reversed, and the matter is remanded to the Superior Court for proceedings not inconsistent with this opinion.

*So ordered.*

Rule 1 of the Uniform Summary Process Rules, incorporating by reference Massachusetts Rules of Civil Procedure in those instances where summary process actions are neither prescribed by nor inconsistent with the uniform rules.