Ferrara, John S., J.
I. Introduction
The plaintiffs, all Milford residents, brought this putative class action against the Milford Water Company, which owns and operates the public water system for Milford and surrounding communities, due to a water contamination incident in August of 2009. In what remains of their amended complaint, the plaintiffs allege negligence (Count I), gross negligence (Count II), breach of contract (Count III), breach of common-law warranties (Count VIII), and violation of G.L.c. 93A, §§2, 9 (Count IX).[2]
Before the Court are the plaintiffs’ motion for partial summary judgment on their claims for breach of contract, breach of common-law warranties, and violation of G.L.c. 93A, and the defendant’s motion for summary judgment on all counts of the plaintiffs’ amended com *467 plaint. Both parties have also moved to strike certain materials submitted by the other side, and the plaintiff has moved for a continuance and for a default judgment against the defendant. For the following reasons, the motions are allowed in part and denied in part.
II. Background
The summary judgment record discloses the following undisputed facts, with some details being reserved for the legal analysis.
Pursuant to a water service tariff filed with the Department of Public Utilities (DPU), the defendant, as a private and for-profit corporation, sells water to approximately 9,000 Milford residents. The defendant uses filtration and disinfection processes to treat the water entering its distribution system from its supply source, Echo Lake, a 288-acre lake accessible by humans and animals. The defendant owns and operates water storage tanks in Milford on Congress Street, Highland Street, and Bear Hill. The Congress Street water storage tank was placed into service in 1925, and as of August 2009, it had a capacity of approximate one million gallons. Milford Water Company had failed to clean and annually inspect the three water tanks as required by the Department of Environmental Protection. A complete inspection of the Congress Street storage tank had not been completed for at least fifteen years prior to August 1, 2009.
On Saturday, August 8, 2009, the defendant notified the Department of Environmental Protection (DEP) that two routine water samples collected on August 5th were confirmed positive for total coliform and one sample was positive for E. coli, and that all six repeat samples collected on August 7th were presumed to be positive for total coliform. Pursuant to 310 Code Mass.Regs. §22.05(8) (b) in effect at that time, this constituted a violation of the Maximum Contaminant Level (MCL) for total coliform. At approximately 9 p.m. on August 8th, the DEP verbally ordered a “boil water order’’ to be in place for the entire town of Milford until one round of special water samples was found to be bacteria-free.
The same night, the defendant’s manager, Henry Papuga, ordered an increase of the chlorination of the water. Papuga also notified town officials, via voicemail messages on their telephones, of the test results and the boil water order.
The Town began notifying residents of the boil water order that weekend. On Monday, August 10th, the DEP informed Papuga in writing that it had determined that the water “could pose an unacceptable risk to public health’’ and that the boil water order would be in effect until terminated by the DEP in writing.[3] The boil water order directed consumers either to boil their tap water for at least one minute before consuming it or to consume water from an alternative source approved by the DEP until further notice. Hie DEP ordered the defendant to notify the public and local officials of the contamination and the boil order, to implement an emergency response plan, to provide additional disinfection, to conduct repeat monitoring for total coliform, and to submit an emergency response report as well as an updated water distribution map and staffing plan. Despite these circumstances, on August 10, 2009, at a Milford Board of Selectmen’s meeting aired on local cable television, Papuga stated that “the water as of right now is absolutely fine” and “all of our tests have come back that the water is absolutely perfect to drink . . .”
On August 12th and August 13th, the water test results still showed contaminated water. On August 19th, the boil water order was lifted for most of Milford’s residents, except for some near the Hopkinton border, where water samples still showed the presence of coliform. The boil water order there was lifted on August 21, 2009. The defendant paid for bottled water to be made available to Milford residents while the boil water order was in effect.
Some or all of the plaintiffs suffered from diarrhea and stomach cramps during and after the week of August 5, 2009, as well as economic losses which they allege were caused by the water contamination incident.
The source of the bacterial contamination remains in dispute. The plaintiffs have presented evidence that holes in the roof of the Congress Street water tank, and the defendant’s failure to clean, inspect and maintain that tank for an extended period, in violation of applicable regulations, likely caused the contamination. The defendant’s experts have opined that the contamination source was water from Echo Lake.
The DEP commenced an enforcement action against the defendant. On November 13, 2009, the DEP issued an Administrative Consent Order which required the defendant to submit a series of reports, plans and related materials to show compliance with applicable standards. Pursuant to the Consent Order, the defendant: (1) did not admit or deny facts or allegations, (2) agreed not to contest those facts or allegations “for purposes of the issuance or enforcement of the Consent Order,” and (3) waived judicial review of the Consent Order.
Two other administrative proceedings before the DPU (DPU Nos. 09-70 and 10-78)[4] culminated in settlements between the Town of Milford and the defendant.
III. Status of Class Certification
A preliminary issue raised in the defendant’s cross motion for summary judgment is whether the plaintiffs have been certified as a class and, as the defendant contends, whether a ruling on the plaintiffs’ summary judgment motion as to all members of the putative class would be premature.
“Although our Rule 23 . . . does not provide for a motion to certify that an action may proceed as a class action, such motions are often necessary and desirable for the efficient handling of class actions.” Carpenter v. Suffolk Franklin Savings Bank, 370 Mass. 314, 317 (1976). The Court has discretion to make preliminary rulings on class action issues. Id. The *468 Court need not conduct an evidentiary hearing. See Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 85 (2001).
A class action may be maintained under rule 23(a) only if findings are made that: “(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.” Rule 23(b) further requires findings that “questions of law or fact common to the members of the class predommate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.”
Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 391 (2004), quoting Mass.R.Civ.P. 23.
At no time have the plaintiffs moved for class certification. The defendant raised the issue in its motion to dismiss, arguing that the class should not be certified. After a hearing on the motion to dismiss, the Court (Curran, J.) issued a written decision focusing on the disputed aspects of the class certification issue: whether the plaintiff had met the requirements as to the non-chapter 93A claims under Mass.R.Civ.P. 23 of predominance of common issues and superiority of the class action for adjudication. Judge Curran concluded that both of these requirements were met, and that at that stage, “it is premature to dismiss the case on grounds of class certification.”
Judge Curran’s discussion of the class certification issue amounted to preliminary conclusions in response to amotion to dismiss. Judge Curran assessed many of the class certification requirements but did not (and could not, on a motion to dismiss) issue findings as required by Rule 23, nor did he address class certification with respect to the chapter 93A claim. The court records disclose no express or formal determination of class certification. Contrary to the plaintiffs’ argument, a class has not yet been certified in this action and the Court invites the plaintiffs to proceed expeditiously by filing a motion for class certification. See Carpenter v. Suffolk Franklin Sav. Bank, 370 Mass. at 317. It follows that the Court, in ruling on the motions before it, considers only the claims of the named plaintiffs rather than those of the proposed class.
IV. Collateral Estoppel and Admissibility Issues
The parties dispute whether the DEP Adminstrative Consent Order and the two DPU Settlement Offers have issue preclusive effect in this action.
The term “res judicata” includes both claim preclusion and issue preclusion . . . Issue preclusion prevents litigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies . . . Before precluding a party from relitigating an issue, a court must determine that (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication . . . Additionally, the issue decided in the prior adjudication must have been essential to the earlier judgment.
Kobrin v. Bd. of Registration in Medicine, 444 Mass. 837, 843-44 (2005) (internal citations and quotations omitted). Although in the case of a consent judgment, none of the issues is actually litigated, the consent judgment .may be conclusive with respect to one or more issues if the parties have entered an agreement manifesting such an intention. See Turner v. Community Homeowner’s Assoc’n, Inc., 62 Mass.App.Ct. 319, 327 (2004).
The DEP Administrative Consent Order does not have issue preclusive effect with respect to the facts or allegations stated therein. The defendant’s agreement not to contest the facts or allegations was explicitly limited to the purposes of the issuance or enforcement of the Consent Order. The defendant did not manifest an intent to render the Consent Order conclusive as to those issues (stated in the uncontested facts and allegations) beyond the scope of the Consent Order. See Turner v. Community Homeowner’s Assoc., Inc., 62 Mass.App.Ct. at 327.
Nor does collateral estoppel apply to the two DPU Offers of Settlement, as neither qualifies as “a final judgment on the merits in the prior adjudication.” See Kobrin v. Bd. of Registration in Medicine, 444 Mass. at 843; Jarosz v. Palmer, 436 Mass. 526, 536 (2002) (a stipulation of dismissal constitutes a final jiidgment for purposes of claim preclusion but not issue preclusion).[5]
V. Cross Motions for Summary Judgment
Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007), citing Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). If the affidavits, pleadings, and other discovery materials demonstrate the lack of a “genuine issue as to any material fact,” then summary judgment is proper. DuPont v. Commissioner of Corr., 448 Mass. 389, 397 (2007); Mass.R.Civ.P. 56(c).
A. Breach of Contract (Count III)
To prevail on a breach of contract claim, the plaintiffs must prove that a valid contract existed, that the plaintiffs were willing and able to perform under the contract, that the defendant breached the contract, and that the plaintiffs suffered damages as a result of the breach. See Singarella v. City of Boston, 342 Mass. 385, 387 (1961).
The plaintiffs claim entitlement to summary judgment on this count, arguing that (1) it is undisputed that the defendant sold contaminated water to the plaintiffs, *469 and (2) in ruling on the defendant’s motion to dismiss, the Court (Curran, J.) determined that, “There is a contractual relationship between the [defendant] and the [plaintiffs], which the former arguably breached by providing contaminated water.” The defendant counters that the plaintiffs will not be able to prove either that the water services tariff constitutes a contract or that the defendant’s conduct caused harm to the plaintiffs.
1. Whether Tariff Constitutes a Contract
The plaintiffs’ claim that the tariff is a contract rests upon Section 3(c) of the tariff, which provides that, “[w]hen accepted by the [defendant], the application [for water service] shall constitute a contract between the [defendant] and the applicant, obliging both parties to comply with these Rules and Regulations.”[6]
The defendant contends that because the water tariff is heavily regulated by the DPU, it is not a contract and that the DPU, rather than this Court, has jurisdiction. Where the nature of the dispute is the legaliiy of the rate, which is a highly regulated matter, the administrative agency which approved of the tariff has jurisdiction, whereas the Superior Court has jurisdiction over controversies regarding the calculation of bills. See Spence v. Boston Edison Co., 390 Mass. 604, 612 (1983). See also Boston Edison Co. v. Boston, 390 Mass. 772, 777 (1984) (because electricity rates are not set by parties but legislatively, and utility companies must file a rate change request with administrative agency, a dispute concerning the rate charged “takes that subject out of the realm of ordinary contract in some respects, and places it upon the rigidity of a quasi-statutoiy enactment”) (emphasis added); B.P.W. Plastics Corp. v. Mass. Elec. Co., 5 Mass.App.Ct. 882, 883 (1977) (Superior Court has jurisdiction to determine correctness of calculation of electric bills).
The dispute here concerns neither the calculation of the bills nor the legality of the rate, but rather whether the defendant breached a putative contract by providing contaminated water to the plaintiffs. There does not appear to be a dispute over the interpretation of a particular term or phrase in the tariff. Contrast id. at 613 (“Since it is clear that the meaning of ‘apartment’ depends on the construction of a tariff rather than a contract, the BHA should have brought its complaint to the DPU”). Moreover, although the defendant’s rates are heavily regulated, the regulation of water quality — which is the paramount issue here— is governed by the DEP, not the DPU.
A closer question is presented in a 1993 case in which plaintiffs sued an electric company for economic losses due to power outages. There, the Supreme Judicial Court affirmed entry of summary judgment for the electric company, reasoning, “it must be understood that the extensive legislative regulation of Edison’s rates and practices takes the furnishing of electricity out of the realm of contract law ... The tariff in question does not create a contract.” FMR Corp. v. Boston Edison Co., 415 Mass. 393, 396 (1993). In that case, the tariff did not expressly create a contract. In contrast, the tariff here unequivocally states that it constitutes a contract between the defendant and the plaintiffs, as applicants for the water service. Therefore, the defendant has not shown that the plaintiffs’ breach of contract claim fails for lack of a contract or this Court’s jurisdiction.
2. Causation
Equally unavailing is the defendant’s next argument that, as a matter of law, the plaintiffs cannot show that they suffered harm as a result of the August 2009 contamination incident. Causation is generally a factual question for determination by the fact finder. See, e.g., White v. American Cas. Ins. Co., 53 Mass.App.Ct. 66, 73 n.7 (2001). Evidence that certain plaintiffs lived in an area of Milford in which no water samples tested positive for contamination does not entitle the defendant to summary judgment. Regardless of whether or not their water comes from the Congress Street tank, it is undisputed that: (1) for over one week, the plaintiffs’ water was deemed by the DEP to be unfit for human ingestion; (2) all of the plaintiffs were forced to resort to other means of obtaining water; and (3) some plaintiffs suffered physical harm which may have been caused by the water contamination. While the nature and degree of injury may vary among the plaintiffs, the defendant has not shown that the plaintiffs will not be able to prove that they were harmed by the water contamination incident.
Nor is there merit to the defendant’s argument that it cannot be held liable under any theory for alleged harm to the plaintiffs because the contamination occurred as a result of a cause beyond the defendant’s control. Section 8(f) of the defendant’s water service tariff provides that the defendant “shall not be liable for any damage or inconvenience suffered by the customer as a result of any cause beyond the [defendant’s] control.” The defendant’s expert opines that the contamination began in Echo Lake, due to its accessibility by humans and animals, and that this cause of contamination is beyond the defendant’s control. This does not erase the factual question regarding the cause of contamination or the defendant’s ability to control it, as other evidence supports the conclusion that the contamination may have been caused by the defendant’s failure to maintain adequately, for an extended time, the Congress Street water tank, which was undeniably within the defendant’s control.
The plaintiffs also point to Section 8(c) of the tariff, which provides that the defendant will not
permit its mains or service pipes to be connected in any way to any pipes ... or other apparatus which contain liquids, chemicals or other pollution which can flow back into the [defendant’s] mains and consequently endanger the common water supply.
The summary judgment record contains factual questions about whether the defendant breached this term *470 of the tariff by connecting its pipes to an apparatus containing pollution which could or did flow into the defendant’s mains and thereby endangered or contaminated the water. This and numerous other material factual questions concerning the cause of the water contamination preclude summary judgment for either party on Count III of the plaintiffs’ amended complaint.
B.Breach of Common-Law Warranties (Count VIII)
In their amended complaint, the plaintiffs allege that the defendant “made express and/or implied written and/or oral promises or affirmations that the water it sold would be free of contamination and otherwise fit for human consumption and use” and that it “breached its common law warranties to the plaintiffs.’’[7] One basis for this claim is Papuga’s statement on August 10, 2009, at a Milford Board of Selectmen’s meeting, aired on local cable television, that “the water as of right now is absolutely fine” and “all of our tests have come back that the water is absolutely perfect to drink .. .”
The defendant argues that the breach of warranty claim fails because the water it treats and distributes to the plaintiffs is a service rather than a good, and thus is incongruous with breach of warranty claims. It is undisputed that the defendant did not create or manufacture the water, but captured it, treated it, and distributed it to its customers. Thus, the defendant argues, there is no viable breach of warranty claim because the predominant purpose of the defendant’s activity is the rendition of services rather than the sale of goods. See Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 141-42 (2002) (where public water supply was contaminated, it was proper to dismiss claim under the Uniform Commercial Code [UCC] for breach of an implied warranty where the predominant purpose of the defendant’s activity was the provision of services rather than sale of goods, and the UCC does not cover the rendition of services).
Mattoon is distinguishable from the present case. In Mattoon, the water provider was a municipality rather than a for-profit corporation, as is the defendant here. The Court in Mattoon noted that, “[w]here a contract is for both sales and services as here, in order to determine whether art. 2 is applicable, the test is whether ‘the predominant factor, thrust, or purpose of the contract is ‘the rendition of service, with goods incidentally involved.’ ” Id., at 141 (internal cite omitted). In applying the predominant factor test, the Court further noted, “although the city charged a sum for the water, that rate reflected the cost of storage, treatment and distribution. Thus, it is clear that the predominant factor, thrust, or purpose of the activiiy was the rendition of services and not the sale of goods.” Id., at 141-42. The Cily of Pittsfield was providing a service to its constituents, not selling a product. The Mattoon Court also noted that its decision was dictated in large part by public policy. The Cily was providing a service to its constituents in its storage and management of the Cify’s resources.[8] The defendant does not deny, as a for-profit corporation, that the cost of water it charges to the plaintiffs includes profit. The defendant has not established, given its for-profit status, that the predominant thrust of its activity was the rendition of services rather than the sale of goods, nor do public policy considerations favor the defendant over its customers. Accordingly, the defendant is not entitled to summary judgment on Count VIII.
C.Violation of G.L.c. 93A, §§2, 9 (Count IX)
In Count IX of its amended complaint, the plaintiffs contend that the defendant violated G.L.c. 93A by, inter alia, knowingly and willfully: (1) failing to maintain and operate adequately its water supply system, in violation •of numerous regulations; (2) failing to disclose to the plaintiffs the inadequacy of its maintenance system, management system, and notification system; (3) failing to inform the public adequately of the contamination; and (4) misrepresenting the safely of the water it sold before and during the 2009 contamination event.
The defendant asserts that regulatory violations, without more, do not qualify as violations of c. 93A. There is no dispute that the defendant violated 310 Code Mass.Regs. §22.05(8), which sets maximum allowable contaminant levels in water samples; factual disputes exist regarding other alleged regulatory violations.
Some safety regulation violations can ampunt to a violation of G.L.c. 93A. Pursuant to G.L.c. 93A, §2(c), the Attorney General can issue rules and regulations interpreting the provisions of c. 93A, §2. Among those regulations is the following:
Without limiting the scope of any other rule, regulation, or statute, an act or practice is a violation of M.G.L.c. 93A, §2, if . . . (3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public’s health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of the Commonwealth protection . . .
See 940 Code Mass.Regs. §3.16(3). Whether a violation is unfair or deceptive conduct depends upon the facts and circumstances of each case. See Darviris v. Petros, 59 Mass.App.Ct. 323, 330-31 (2003).
The plaintiffs have presented evidence that the defendant violated water safety regulations intended to protect public health, and that the defendant knew or should have known that it was not complying with regulatoiy standards to protect the quality of the water. Factual questions concerning the nature and extent of the defendant’s regulatory violations preclude entry of summary judgment on Count IX.
D.Recovery for Economic Losses Absent Evidence of Personal Injury or Property Damage
The defendant also requests summary judgment to the extent that some of the plaintiffs seek recovery for economic losses but have not suffered personal injuries or property damage. The defendant points to the economic loss rule, which instructs that “purely economic *471 losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.” FMR Corporation v. Boston Edison Co., 415 Mass. 393, 395-96 1993). See also Garweth Corp. v. Boston Edison Co., 415 Mass. 303, 304-06 (1993).
The plaintiffs do not dispute that two of the plaintiffs, Jameson Mello and Julie Gamy, suffered no personal injury. Therefore, those two plaintiffs may not recover for economic losses on their claims for negligence, gross negligence, or for violation of G.L.c. 93A, to the extent that any award under the latter rests upon negligence. They may be able to recover economic losses, however, if they prevail on their claim for breach of contract or G.L.c. 93A, if the latter is not based upon negligence.
VI.Defendant’s Motion to Strike Portions of the Plaintiffs’ Summary Judgment Record
The defendant moves to strike the DEP Consent Order, the two DPU Offers of Settlement, and a plethora of other materials, some of which are referenced in this decision. As explained above, the plaintiffs have not shown that issue preclusion applies to the DEP Consent Order or to the DPU Offers of Settlement. Nor has the defendant established their irrelevance. On the other hand, the motion to strike is allowed as to the 2011 DEP Demand for Payment of Suspended Administrative Penalty, which is irrelevant to this action as it is currently pled.
The defendant’s effort to strike an extensive list of other materials is less successful. Among these documents are the boil water order, water safely reports, and communications between Papuga and the DEP, the defendant’s directors, and others. While many of these materials do not aid the plaintiffs, they are, for the most part, pertinent to the plaintiffs’ arguments. The defendant does not undertake an individualized assessment of the relevancy of the remaining documents, obviating the need for the Court to assume that task.
VII.The Plaintiffs’ Motions to Strike
The plaintiffs first ask the Court to strike the affidavit of the defendant’s expert, David L. Condrey, claiming that it mounts defenses not previously disclosed in discovery. Specifically, the plaintiffs assert that they were unaware until after discovery that the defendant would use as a defense Condrey’s testimony that the Milford water system has two distinct areas in its pressure system. The aim of this evidence would be to establish that not all Milford water consumers received contaminated water, since the water which tested as contaminated was only in one of the two pressure areas. Although the defendant did not raise this specific issue in its written answers during discovery, the existence of two distinct parts of the Milford public water system, and the fact that one had contaminated samples, was no secret and was communicated repeatedly to the plaintiffs. It was first explained in the DPU public hearing by the defendant’s president, David White. At the hearing, attended by the plaintiffs’ counsel, White explained that one of the two areas never tested positive for contamination during the August 2009 incident, and that the other area had the longer boil water order in place. The defendant produced a copy of this transcript to the plaintiffs during discovery. It also produced to the plaintiffs maps distinguishing the high and low pressure areas of the Milford water distribution system.
The plaintiffs also move to strike the affidavit of John N. McClellan. In its supplemental answers to the plaintiffs’ interrogatories, the defendant identified McClellan and disclosed his testimony concerning evidence of the cause of the contamination. McClellan’s testimony at that time was that:
While it is possible that the positive bacteria results resulted from introduction of bacteria into the tank through the tank roof, there are several other explanations that are at least as likely. None of the materials I have reviewed provide a basis for drawing the firm conclusion that bacteria entered the Company’s distribution system through the Congress Street Tank roof. In fact, such materials do much more dearly support a conclusion that Echo Lake was the source of the bacteria . . .
(Emphasis added.) The plaintiffs take issue with a variation from this in McClellan’s affidavit, in which he writes, instead of “do much more clearly support” “do support a conclusion to a reasonable degree of scientific certainly.” The variation, in the context of this case, does not amount to a nondisclosure justifying striking the affidavit.
These determinations regarding Condrey’s and McClellan’s affidavits compel the denial of the plaintiffs’ related motion, styled as The Plaintiffs’ Motion for Default Judgment or, in the Alternative, to Strike Milford Water’s Defenses Concerning the Source of Contamination and the Alleged “High Pressure Area/Low Pressure Area” Distinction and the Affidavit/Testimony of David L. Condrey and John N. McClellan and to Award Plaintiffs Their Attorneys Fees and Costs.
VIII.The Plaintiffs’ Motion for Continuance Pursuant to Rule 56
In this motion the plaintiffs request partial summary judgment in their favor and against the defendant, but, if that does not occur, they alternatively seek a continuance to conduct further discovery in two areas: (1) what the plaintiffs refer to as previously undisclosed defenses, and (2) the September 11,2011, indictment of Papuga on chárges that he made false statements and tampered with water samples during the August 2009 contamination incident.
Although the Court rejects the plaintiffs’ characterization of previously undisclosed defenses, this motion is denied as moot. On April 13,2002, the Court allowed the parties’ joint motion to amend the tracking order (docketed as #32) to permit discovery until October 1, 2012.
ORDER
For the foregoing reasons, it is hereby ORDERED that:
*472 (1) the Plaintiffs’ Motion for Partial Summary Judgment as to Liability and Multiple Damages (#24) is DENIED;
(2) the Defendant Milford Water Company’s Motion to Strike Portions of the Plaintiffs’ Summary Judgment Record (#25) is ALLOWED with respect to the DEP Demand for Payment of Suspended Administrative Penalty and is otherwise DENIED;
(3) the Milford Water Company’s Cross Motion for Summary Judgment (#26) is ALLOWED only insofar as the economic loss rule bars recovery by Jameson Mello and Julie Garny, as explained above; the motion is otherwise DENIED;
(4) the Plaintiffs’ Motion to Strike the Affidavit of David L. Condrey (#27) is DENIED;
(5) the Plaintiffs’ Motion to Strike the Affidavit of John N. McClellan (#28) is DENIED;
(6) the Plaintiffs’ Motion for Default Judgment or, in the Alternative, to Strike Milford Water’s Defenses Concerning the Source of Contamination and the Alleged “High Pressure Area/Low Pressure Area” Distinction and the Affidavit/Testimony of David L. Condrey and John N. McClellan and to Award Plaintiffs Their Attorneys Fees and Costs (#29) is DENIED; and
(7) the Plaintiffs’ Motion for Continuance Pursuant to Rule 56 (#30) is DENIED as moot.

 The Court (Curran, J.) allowed the defendant’s motion to dismiss Counts IV through VII and Count X.

 The written boil water order states that the defendant is “in noncompliance with the monthly maximum contaminant level (MCL) for total coliform in 310 CMR 22.05(8)(a) because more than 5.0% of the samples collected during the month of August 2009 were total coliform-positive” and “in noncompliance with the acute MCL for total coliform in 310 CMR22.05(8)(b)because a total coliform-positive repeat sample followed an E-coli positive routine sample. This violation may pose an acute risk to health as a result of short-term exposure and requires immediate public notification in accordance with 310 CMR 22.16.”

 On September 2, 2009, the Board of Selectmen of the Town of Milford filed a complaint with the DPU concerning the problems with water quality and disruption of service, and sought an investigation to determine whether improvements were necessary to ensure adequate water quality. The Town and the defendant entered into the first offer of settlement (09-70) identifying plans to improve communication and training between the defendant and town officials, to improve maintenance and inspections and to make physical improvements to the defendant’s operations to ensure compliance with regulatory requirements, planning goals and compliance review by the Town. In a second Offer of Settlement between the Town and the defendant and approved by the DPU (DPU 10-78), the parties agreed, inter alia, to “eliminate the balance” of the expenses incurred by each in connection with distributing bottled water and “certain remaining costs associated with the water quality event.”

 The defendant does not, in its motion or supporting memoranda, challenge the admissibility of the Consent Order or the DPU Offers of Settlement, or of the defendant’s answer to an interrogatory, in which the defendant concedes that:
With respect to the Congress Street tank, the chlorine contact chamber and hydraulic model and maps, [the defendant] does not contend that the actions required under the Administrative Consent Order could not feasibly have been implemented prior to on or about August 5, 2009.
This statement is admissible under Section 407 of the Massachusetts Guide to Evidence, which instructs that although evidence of subsequent remedial measures is inadmissible to prove negligence or culpable conduct, “[tjhis does not require the exclusion of evidence of subsequent or preceding measure when offered for another purpose, such as proving... feasibility of precautionary measures . . .” Therefore, the defendant’s answer to this interrogatory is admissible for the limited purpose of proving the feasibility of the defendant having implemented the actions required under the Administrative Consent Order with respect to the Congress Street tank, the chlorine contact chamber and hydraulic model and maps.

 In arguing that a contract existed, the plaintiffs point to Judge Curran’s decision on the defendant’s motion to dismiss. The familiar standard for a motion to dismiss is to review the sufficiency of the complaint, taking the allegations and the reasonable inferences from it in the plaintiffs’ favor, and to determine whether the factual allegations plausibly suggest an entitlement to relief. See Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 223 (2011). Judge Curran’s determination that the plaintiffs’ allegations plausibly suggested an entitlement to relief does not relieve the plaintiffs of their burden of proving the existence of a contract.

 The plaintiffs’ three other warranty claims (Count V, breach of express warranty [G.L.c. 106, §2-313], Count VI, breach of implied warranty for fitness [G.L.c. 106, §2-315], and Count VII, breach of the implied warranty of merchantability [G.L.c. 106, §2-314]) were dismissed by Curran, J. in ruling on the defendant’s motion to dismiss. At that juncture, as here, the parties sparred over whether the matter was governed by Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 141-42 (2002). The plaintiffs did not expressly argue in their written opposition that the defendant’s status as a for-profit corporation would alter the analysis.

 The Court would also note that the Mattoon decision reflects a minority view of the applicability of implied warranties to the sale of water, and public policy considerations clearly weighed in the result in that case. See, Adel v. Greensprings of Vermont, Inc., 363 F.Sup.2d 692 (2005):
The Court and the parties have identified eight cases that consider whether water suppliers are sellers of goods under Article 2 of the UCC. Six courts have held that water is a good and that water suppliers are merchants. See Dakota Pork Indus. v. City of Huron, 2002 SD 3, 638 N.W.2d 884, 886 (S.D. 2002); Mulberry-Fairplains Water Ass’n, Inc. v. Town of North Wilkesboro, 105 NC.App. 258, 412 S.E.2d 910, 915 (N.C.App. 1992); Sternberg v. N.Y. Water Serv. Corp., 155 A.D.2d 658, 548 N.Y.S.2d 247, 248 (N.Y.App.Div. 1989); Gall v. Allegheny County Heath Dep’t., 521 Pa. 68, 555 A.2d 786, 789 (Pa. 1989); Zepp v. Mayor & Council of Athens, 180 Ga.App. 72, 348 S.E.2d 673, 677-78 (Ga.App. 1986); Moody v. City of Galveston, 524 S.W.2d 583, 586-87 (Tex.Civ.App. 1975). In contrast, only two courts have held that the furnishing of water is not a sale of goods under the UCC. See Mattoon v. City of Pittsfield, 56 Mass.App.Ct. 124, 775 N.E.2d 770, 784 (Mass.App.Ct. 2002); Coast Laundry, Inc. v. Lincoln City, 9 Ore.App. 521, 497 P.2d 1224, 1227-28 (Or.App. 1972). Thus, a clear majority of the jurisdictions that have considered the issue hold that water is a good under the UCC.
Id., at 697.